UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROKT CORP. and ROKT PTE LTD., <br><br> Plaintiffs, <br><br> v. <br><br> ADSPOSTX, INC., JON NOLZ, and SUROJIT NIYOGI, <br><br> Defendants. | Civil Case No. _____ <br><br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Rokt Corp. and Rokt Pte Ltd. (collectively, "Rokt"), by and through their undersigned counsel, for its Complaint against Defendants AdsPostX, Inc. ("AdsPostX"), Jon Nolz ("Nolz"), and Surojit Niyogi ("Niyogi," and collectively, with AdsPostX and Nolz, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This case involves a former senior executive of Rokt's client Groupon, Inc. ("Groupon") who, along with his business partner who pretended to be a merchant-customer of Rokt, conspired with their new start-up business AdsPostX: (i) to misappropriate Rokt's trade secret information in direct violation of their legal and contractual obligations; (ii) to improperly disclose that information to their start-up company, AdsPostX, a direct competitor of Rokt; and (iii) to help AdsPostX engage in unfair competition against Rokt by misappropriating Rokt's confidential and proprietary information.

2.      Rokt is one of the world's leading e-commerce enablement and marketing technology companies and recently attained a valuation of $2.4 billion.

3.      Over the past eleven years, Rokt has made substantial investments in research and development, through which Rokt developed innovative, cutting-edge technologies and business

practices that have revolutionized the customer experience in e-commerce.  As such, Rokt's sensitive, confidential, and proprietary information, constituting its trade secrets, form the backbone of its business.

4.     Through improper means and in breach of applicable agreements, Defendants have collected and exploited Rokt's trade secrets and confidential information for their own commercial gain.

5.     As Rokt recently discovered through its preliminary investigations, Defendants surreptitiously acquired Rokt's valuable trade secrets to launch a competing business, AdsPostX.

6.     AdsPostX offers a copycat platform that, based upon information and belief, AdsPostX could not have built without Rokt's trade secrets and proprietary information.

7.     Using the misappropriated trade secrets and confidential information, Defendants are now competing directly with Rokt by offering effectively the same platform and services, soliciting Rokt's clients and prospective partners, and disparaging and drawing critical comparisons to Rokt in marketing materials.

8.     Critically, because Defendants accessed and collected Rokt's trade secrets and confidential information, Defendants are able to target Rokt's high-value clients and partners and disclose confidential information regarding Rokt's business in marketing materials and solicitations for purposes of luring clients away from Rokt.

9.     Defendants have irreparably harmed Rokt through their disclosure of Rokt's trade secrets, solicitation of Rokt's key clients, and attacks on Rokt's reputation.  Defendants, who upon information and belief, only recently launched with their first e-commerce client in late February 2023, have also shown that they will continue to irreparably harm Rokt by further impairing the value of Rokt's trade secrets and its reputation and goodwill if an injunction does not issue.

10.    Rokt therefore seeks preliminary and permanent injunctions; damages, including exemplary and punitive damages; pre-judgment and post-judgment interest; and attorneys' fees and costs, pursuant to 18 U.S.C. § 1836(b)(3) and New York law.

## THE PARTIES

11.    Plaintiff Rokt Corp. is indirectly a wholly owned subsidiary of Plaintiff Rokt Pte Ltd. and is organized under the laws of the State of Delaware, with its principal place of business at 175 Varick Street, 10th Floor, New York, New York 10014.

12.    Plaintiff Rokt Pte Ltd. is a corporation, organized and existing under the laws of Singapore, with its principal place of business at 109 North Bridge Road, #05-21 Singapore, 179097.

13.    Defendant AdsPostX, Inc. is a corporation, organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business in Seattle, Washington.  Upon information and belief, AdsPostX's principal place of business is at 1624 Shenandoah Drive E, Seattle, Washington 98112.

14.    Defendant Jon Nolz is Chief Executive Officer and co-founder of AdsPostX and, upon information and belief, resides at 1624 Shenandoah Drive E, Seattle, Washington 98112.

15.    Defendant Surojit Niyogi is Chief Product Officer and co-founder of AdsPostX and, upon information and belief, resides at either 2712 Cascade Falls Drive Austin, Texas 78738 or 5009 Spanish Oaks Club Boulevard, Austin, Texas 78738.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over Rokt's federal misappropriation of trade secrets claim pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), and has supplemental jurisdiction over Rokt's state law claims pursuant to 28 U.S.C. § 1367 because they are so related

to Rokt's federal misappropriation of trade secrets claim that they form part of the same case or controversy under Article III of the United States Constitution.

17.     AdsPostX is subject to this Court's personal jurisdiction because AdsPostX does business in the State of New York, committed the torts of trade secret misappropriation and unfair competition in the State of New York causing injury to Rokt in the State of New York, and misappropriated Rokt's confidential and trade secret intellectual property that is stored in the State of New York.

18.     Nolz is subject to this Court's personal jurisdiction because he committed and purposefully directed conduct that constitutes trade secret misappropriation, unfair competition, and fraud for the benefit of AdsPostX into the State of New York, caused injury to Rokt in the State of New York, and misappropriated confidential and trade secret information stored in New York.

19.     Niyogi is subject to this Court's personal jurisdiction because he consented to this Court's jurisdiction by entering into the Rokt Platform Services Agreement, which states that the "Parties to this Agreement submit to the exclusive personal jurisdiction of the state and federal courts located in New York."  Niyogi is also subject to this Court's personal jurisdiction because he committed and purposefully directed conduct that constitutes trade secret misappropriation and unfair competition for the benefit of AdsPostX into the State of New York, caused injury to Rokt in the State of New York, and misappropriated confidential and trade secret information stored in New York.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### *Rokt's Business and Confidential and Proprietary Information*

21.     Founded in 2012, Rokt is a global leader in the e-commerce enablement and marketing technology industries, helping companies generate ancillary revenue on their e-commerce websites, acquire new customers at scale, and deepen relationships with existing customers.

22.     Rokt provides innovative services to clients in in a variety of industries, including financial services, food and beverage, media, and entertainment.

23.     Among its other services, Rokt operates a marketplace in which e-commerce companies provide personalized, relevant experiences to their customers through the display of third-party offers or advertisements from some of the world's largest advertisers and brands.

24.     Rokt also helps e-commerce companies optimize their own first-party offers or upsells as well as directly cross-selling a third-party's product or service as part of one transaction.

25.     For e-commerce sites, Rokt helps deliver substantial ancillary revenue, increasing their profit margin for each online transaction.

26.     For advertisers, Rokt helps serve their offers to the right people at the right time, *i.e.*, in the "transaction moment," when purchasers are receptive to additional offers.

27.     Rokt's publicly known clients include Ticketmaster, Poshmark, and AMC Theaters.  However, the majority of Rokt's clients are maintained as confidential.

28.     Rokt has developed its innovative, cutting-edge technologies and business practices that have revolutionized the customer experience in e-commerce through its substantial investment in research and development over the past eleven years.

29.     Rokt's technologies and business practices were not available in the marketplace before being deployed by Rokt, and no other company has developed such an approach until

AdsPostX recently launched its business. AdsPostX, however, could not have developed these competitive services in a fraction of the time without its misappropriation of Rokt's trade secrets.

30.    Sensitive, confidential, and proprietary information constituting Rokt's trade secrets form the backbone of Rokt's business.

31.    Such trade secrets include, *inter alia*, information regarding Rokt's most profitable advertisers, advertiser verticals, and advertiser sub-verticals that Rokt works with and that a competitor would want to immediately target; the relative performance of different user experiences ("UX") and user interfaces ("UI") as measured and tested by Rokt for over a decade, which would allow a competitor to build its own UX and UI in reliance on Rokt's historical performance data; and the functionalities of Rokt's proprietary client portal, "One Platform."

32.    After over a decade of efforts to develop and grow its business including through substantial financial investments, Rokt won numerous awards for its trailblazing business and technological achievements, including, but not limited to, 2022 and 2020 *Crain's Fast 50*; 2022 and 2021 *Inc. 5000's  Fastest Growing Companies in America*; 2021 *MarTech Breakthrough Awards' "Best Overall Conversion Optimization Solution"*; 2021 *Think Global Award*, 2021 *Latka 250 Fastest Growing SaaS Company List*; 2021 *BIG Innovation Award*, and 2020 *MarTech Breakthrough Awards' "Best Use of AI in MarTech."*

33.    Rokt recently attained a valuation of $2.4 billion in December 2022, having built this lucrative business utilizing its confidential and trade secret information. Rokt's recently valuation reflected a 25 percent year-over-year increase from Rokt's December 2021 Series E valuation.[1]

---

[1] *See E-commerce tech startup Rokt valued at $2.4 bln in in latest funding amid plans for IPO*, Reuters (Dec. 5, 20223), https://www.reuters.com/markets/deals/e-commerce-tech-startup-rokt-valued-24-bln-latest-funding-amid-plans-ipo-2022-12-05/

34.     Rokt has taken reasonable and appropriate measures to maintain the confidentiality of its valuable proprietary information, which are not disclosed in any patent applications or filings by Rokt.

35.     For employees, among other measures, Rokt:

     a.     utilizes employee screening procedures;

     b.     requires employees to enter into non-disclosure and confidentiality agreements;

     c.     requires employees to properly categorize and label information as "public," "classified," or "confidential";

     d.     requires employees to undertake compulsory annual training on information security, privacy, and confidentiality;

     e.     restricts employees' access to confidential information based on their role and through technical means, including, *inter alia*, password protection; and

     f.     restricts employees' ability to use storage devices that are not Rokt-approved.

36.     For third parties, including select clients, partners, vendors, suppliers, and consultants, among other measures, Rokt:

     a.     conducts due diligence on and assesses risks, *e.g.*, information security, for suppliers;

     b.     requires third parties to enter into agreements containing strict confidentiality provisions, *e.g.*, non-disclosure agreements or Rokt client agreements restricting access to and use of Rokt's confidential and trade secret information; and

> c. restricts third parties' access to confidential information through technical means, including, *inter alia*, password protection.

37. Rokt also employs physical and technical barriers at its offices and facilities to restrict access to visitors and third parties.

### *Nolz and AdsPostX's Misappropriation of Rokt's Trade Secrets*

38. From April 2019 to at least October or December 2022, Nolz worked as an advertising director for Groupon, one of Rokt's valued clients, and was Rokt's main point of contact with Groupon.

39. In his role, Nolz is believed to have been subject to an employment agreement with Groupon containing confidentiality and non-disclosure provisions that prohibited him from using both Groupon's and Rokt's confidential information for non-Groupon-related purposes.

40. In addition, during that time, Groupon owed contractual confidentiality obligations to Rokt pursuant to a Rokt Platform Ad-Serving Agreement, which Rokt and Groupon executed on or about August 18, 2015 ("Rokt/Groupon Agreement"), a copy of which is attached hereto as **Exhibit A**. Rokt and Groupon also executed a First Amendment to the Rokt/Groupon Agreement on or about January 18, 2018. *See id.*

41. Pursuant to the Rokt/Groupon Agreement, Rokt agreed to perform certain services for Groupon and provide Groupon and its employees with access to Rokt's proprietary and confidential information. Groupon agreed to maintain the confidentiality of Rokt's proprietary information, not to disclose Rokt's confidential information, and only to use Rokt's confidential information in connection with its obligations or the services it was receiving under the Rokt/Groupon Agreement.

42.     Upon information and belief, as a Groupon employee, Nolz was also subject to these provisions of the Rokt/Groupon Agreement and, in his role, was required not to disclose Rokt's confidential information or use it for non-Groupon-related purposes.

43.     While Nolz worked for Groupon, he expressly held himself out to Rokt as a trusted employee of Groupon who was working in the mutual interest of Groupon and Rokt to deploy Rokt's services on the Groupon platform.  In this role, he engendered the trust of Rokt by holding himself out as a Groupon employee who would maintain the confidentiality of Rokt confidential information, abide by his confidentiality obligations, and not use Rokt information for his own purposes or any purpose other than serving the interests of Groupon.

44.     For example, on or about April 29, 2021, Nolz reached out to Sophie Donoghue of Rokt by chat and email and requested sensitive data regarding a campaign run by another Rokt client, a meal kit subscription company, purportedly on behalf of Groupon.

45.     In another example, on or about January 10, 2022, Nolz reached out to Sophie Donoghue of Rokt by chat and email with specific questions, purportedly raised on behalf of Groupon, regarding Rokt's policies and legal positioning on disclosure of user emails and information, in relation to privacy laws.  When Sophie Donoghue provided detailed responses, Nolz asked further questions "which we need clarity on" central to Rokt's legal and business positioning with respect to privacy laws that, as detailed below, is one category of Rokt's confidential and proprietary information constituting its trade secrets.

46.     In yet another example, on April 29, 2022 and May 2, 2022, by emails to Sophie Donoghue and Emma Beach at Rokt, which copied Kevin Grimes at Groupon, Nolz repeatedly requested that Rokt provide mobile in-application mock-ups to share with Groupon's development team.  Nolz also requested information about general performance data.

9

47.     In reliance on these representations, Rokt responded to Nolz's requests and shared confidential and trade secret information about Rokt's technology and business with Nolz.

48.     Nolz was also made aware that the information provided to him by Rokt about its technology and business was confidential and covered by the Rokt/Groupon Agreement.  As such, upon information and belief, Nolz knew that the trade secrets and proprietary information provided to him by Rokt about its technology and business was confidential.

49.     Unbeknownst to Rokt until recently, however, while employed at Groupon when he purportedly needed access to Rokt's confidential and trade secret information in connection with Groupon and Rokt's joint marketing efforts, Nolz was simultaneously requesting and accessing Rokt's confidential and proprietary information to create a business to compete with Rokt, *i.e.*, AdsPostX, which he incorporated in June 2022.  *See* **Exhibit B**.

50.     Indeed, public records show that at the same time that Nolz was employed by Groupon, he was building AdsPostX.  *See* **Exhibit C**.

51.     Without disclosing his interest in AdsPostX or that he was planning on forming a new business that would directly compete with Rokt, Nolz repeatedly requested and obtained information regarding, among other things, how Rokt's proprietary technology operates, advertiser industry verticals and geographies in which Rokt was most successful, Rokt's strategies for delivering value to its clients, Rokt's processes for deploying its technology and services, and other Rokt confidential and trade secret information.

52.     Indeed, emails show that Nolz made concerted efforts to entrench himself in Rokt's confidential projects with Groupon.

53.     By virtue of his position, relationship of trust, contractual confidentiality obligations, and representations, Nolz received, *inter alia*, the following confidential and trade secret information from Rokt:

    a.    The relative value driven by specific advertisers, verticals, and sub-verticals;

    b.    The relative performance of different user experiences, *e.g.*, based on different designs, locations of logos, display and content of "call-to-action" buttons, among other variations;

    c.    Rokt's pricing strategy;

    d.    Rokt's rationale for its revenue share model, including Rokt's cost of goods sold and the relative percentage of profits received by Rokt and the e-commerce partner;

    e.    Rokt's client list;

    f.    Rokt's A/B testing and results of same regarding various strategies;

    g.    Rokt engagement rates with client's end customers by category of e-commerce partner, *e.g.*, engagement rates on food & beverage e-commerce sites v. retail;

    h.    The functionalities of Rokt's proprietary client portal "One Platform";

    i.    Customer acquisition goals of advertisers, including those referred by Groupon;

    j.    Rokt's strategy for "closing the loop" or attributing conversions on an advertiser's page to Rokt and a specific source partner;

k.     Rokt's strategy for managing changes to supply and demand dynamics in its two-sided marketplace, including how Rokt accounts for seasonality;

l.     Rokt's relative revenue performance in various international and domestic markets;

m.     The operation of Rokt's proprietary "Smart Bidding" technology which adjusts advertisers' bid amounts to have their offers shown to certain customers to maximize the likely value to the advertisers;

n.     Rokt's use of non-industry standard reporting metrics to demonstrate to clients the value Rokt helps deliver on their e-commerce sites;

o.     Rokt's methodology for running discrepancy checks between Rokt measurement of revenue performance versus client's measurement of revenue performance;

p.     Rokt's quality score calculations which determine ad ranking in Rokt's proprietary real time bidding system, *i.e.*, they help determine which advertisement is shown to a user;

q.     The advertiser verticals and sub-verticals that Rokt determined over time and in consultation with clients must be whitelisted, meaning advertisers in these vertical and sub-verticals will not run on a partner site unless a partner affirmatively opts in;

r.     Rokt's legal and business positioning with respect to US, EU, and Japanese privacy and marketing laws;

s.  The value of specific components of the Rokt software development kit ("SDK"), which enables third party offers to be shown in iOS and Android apps;

t.  Rokt's strategy for launching new partner products or campaigns, *e.g.*, in-app offers, at appropriate percentage of web traffic and ramping up, balancing revenue goals against quality assurance;

u.  Rokt's checklist for launching new advertisers on the marketplace;

v.  Rokt's anomaly detection capabilities;

w.  Rokt's channel sales / referral strategy, including a step plan for specific activities; and

x.  Groupon's revenue performance on Rokt's technology.

54.  Nolz accessed and received this information under the guise of benefitting the Rokt and Groupon relationship.  But as Rokt only recently discovered, Nolz built AdsPostX based upon Rokt's misappropriated confidential and trade secret information.

### *Niyogi and AdsPostX's Misappropriation of Trade Secrets*

55.  Around the same time, and unbeknownst to Rokt until recently, Nolz's business partner and AdsPostX co-founder Niyogi was also involved in the scheme.

56.  Niyogi's LinkedIn profile shows that Niyogi began his position as co-founder and Chief Product Officer at AdsPostX in April 2022, prior to the company's incorporation in June 2022.  *See* **Exhibit D**.

57.  In August and September 2022, Niyogi signed up for Rokt's services three times, purporting to be a merchant-customer under three different Shopify stores: CustomShirtCo, WinzosMerchShop, and Fonzy's Flippers.

58.     In signing up for these three accounts, Niyogi agreed to abide by Rokt's Platform Services Agreement to access and use Rokt's Shopify App and the Rokt Platform, including Rokt's proprietary client portal called, "One Platform."   Copies of the Platform Services Agreement entered into by Niyogi for the three Shopify stores are attached hereto as **Exhibit E**.

59.     Thereafter, Niyogi had access to:

   a.     the functionalities of One Platform;

   b.     the functionalities of Rokt's Shopify App; and

   c.     Rokt's use of non-industry standard reporting metrics, among other confidential and trade secret information.

60.     The Platform Services Agreement, which incorporates an Acceptable Use Policy, explicitly requires users to "keep this Agreement and the Confidential Information of the other party confidential and use it only for the purposes stated in this Agreement" and prohibits users from "access[ing] the Rokt Platform in order to build a competitive product or service, to build a product using similar ideas, features, functions or graphics of the Rokt Platform, or to copy any ideas, features, functions or graphics of the Rokt Platform." *Id.* §§ 8.8(i), 11.2.

61.     Notably, none of Niyogi's Shopify stores have generated any revenue using Rokt's services, even though generating revenue is the only legitimate reason that a user would use Rokt's Shopify application.

62.     Upon information and belief, none of these Shopify stores have active websites or are operational.

63.     Upon information and belief, Niyogi created the three dummy Shopify accounts as a ruse for the sole purpose of improperly accessing Rokt's confidential and trade secret information.

64.    Upon information and belief, Niyogi collected Rokt's confidential and trade secret information and shared and disclosed same to AdsPostX.

### *Defendants' Unfair Competition and Targeting of Rokt's High-Value Clients*

65.    Upon information and belief, in late February 2023, AdsPostX officially went live with its first e-commerce customer on its platform.

66.    As Rokt then discovered, AdsPostX's platform replicates Rokt's UX and IU.

67.    Defendants could not have built this platform without misappropriating Rokt's trade secrets and relying upon Rokt's decade of investment, research, development, and testing. The confidential results of user experiments that Rokt made available to Nolz during his time at Groupon, which established the relative performance of various possible designs and interfaces, would have been critical to the creation of AdsPostX's platform.

68.    In addition to creating a copycat platform, as Rokt recently learned, Defendants also used Rokt's performance data, which Nolz obtained at Groupon while subject to confidentiality obligations, to target and solicit Rokt's high-value clients and prospective partners.

69.    Without disclosing the names of non-public clients, Rokt discovered that Defendants targeted at least two current confidential e-commerce partners and several current advertisers.

70.    Upon information and belief, Defendants are now operating on several of its e-commerce clients' websites.

71.    Defendants' public announcements and marketing to date also shows that they are trying to aggressively expand to supplant Rokt in the market.

72.    As Rokt's recent investigations revealed, Defendants publicly declared that it intends to compete directly with Rokt and, specifically, in recent marketing, announced that

Defendants launched the AdsPostX platform "to bring optionality, controls and flexibility to a space currently led by Rokt." *See* **Exhibit F**.

73.     Additionally, Defendants have brazenly compared their services to Rokt's in their marketing materials, openly criticizing Rokt's offerings and painting Rokt in a false light.

74.     Defendants' marketing materials further demonstrate that Defendants used and disclosed Rokt's trade secrets and confidential information.

75.     For example, as shown below, in their marketing materials, Defendants claim that Rokt's "Advertiser mix skews to 2-3 top spenders (bids driving revenue not targeting/relevancy)."



76.     Without admitting the truth or accuracy of this statement, it is clear that this this type of information about Rokt is neither publicly available nor readily ascertainable and could have only been obtained by one of the select individuals who have access to Rokt's trade secrets and confidential information.

77.     Defendants' collection, use, and disclosure of Rokt's trade secrets and confidential information have jump-started Defendants' copycat business and given Defendants a substantial

competitive advantage over Rokt in the marketplace, enabling Defendants to directly and unfairly compete with Rokt.

78.     The ongoing conduct of Defendants, which will further impair the value of Rokt's trade secrets and confidential information, demonstrates that Rokt faces irreparable harm unless the Court enjoins Defendants from further using or disclosing Rokt's trade secrets.

79.     Defendants' actions have caused and will continue to cause irreparable harm to Rokt through the loss and disclosure of its invaluable trade secrets, damage to its market-leading position and client relationships, and impairment of Rokt's valuable reputation that it has spent more than a decade building.

80.     Monetary damages would be insufficient to remedy this harm because Rokt has no way to reliably measure or quantify the full harm that Defendants have caused.

81.     Absent injunctive relief, Defendants will continue to use Rokt's misappropriated trade secrets and confidential information to unfairly compete with Rokt, solicit its clients, and tarnish Rokt's reputation in the marketplace.

## COUNT I
### (Misappropriation of Trade Secrets Against All Defendants, Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*)

82.     Rokt repeats, realleges, and incorporates by reference each of the foregoing allegations as if fully set forth herein.

83.     Rokt owns and possesses confidential, proprietary, and trade secret information, including, but not limited to, highly sensitive information relating to Rokt's methodology and functionality of its propriety platforms, pricing and business strategies and rationales, client information, and performance.

84.     Rokt's trade secrets are used in, and intended for use in, interstate and foreign commerce.

85.     Rokt developed its trade secrets over the past eleven years through its substantial investments in research and development and through trial and error.

86.     Rokt's trade secrets are not available to the public, are not disclosed in any of Rokt's patent filings, and are otherwise not readily ascertainable.

87.     Rokt has taken appropriate and reasonable measures to maintain the security and confidentiality of its trade secret information secure, including, among other measures, limiting access to such information to select individuals, requiring employees and third parties to enter into confidentiality and non-disclosure agreements, requiring employees to properly categorize and label trade secret information, and employing technical restrictions.

88.     Rokt's trade secret information derives independent economic value from not being generally known to and not being readily ascertainable, through proper means, by other persons who could obtain economic value from its disclosure or use.

89.     Nolz gained access to and obtained Rokt's trade secrets by virtue of his position at one of Rokt's clients, Groupon, where Nolz was subject to an agreement with strict confidentiality obligations against the disclosure and use of Rokt's confidential, proprietary, and trade secret information.  Nolz also expressly and falsely held himself out to Rokt as a trusted employee of Groupon who was working in the mutual interest of Groupon and Rokt to deploy Rokt's services on the Groupon platform.

90.     Niyogi gained access to and obtained Rokt's trade secrets by signing up for Rokt's services on behalf of three different e-commerce sites and agreeing to Rokt's Platform Services

Agreement, which contains strict confidentiality obligations against the disclosure and use of Rokt's confidential, proprietary, and trade secret information.

91. Defendants intentionally and maliciously misappropriated Rokt's trade secrets by, without limitation, acquiring Rokt's trade secret information with the knowledge or reason to know that it was acquired by improper means, and disclosing and using Rokt's trade secrets without Rokt's express or implied consent, with the knowledge that Rokt's proprietary information was a trade secret and/or the knowledge that Rokt's source code was acquired by improper means.

92. As a direct and proximate result of Defendants' misappropriations, Rokt has suffered, continues to suffer, and will suffer in the future extensive, irreparable injury, loss of goodwill, harm to its reputation and business, and other injuries, including loss of clients and market share, for which there are no adequate remedy at law. Rokt will suffer this harm unless and until Defendants are restrained from their unlawful conduct.

93. Rokt is entitled to a preliminary and permanent injunction pursuant to 18 U.S.C. § 1836(b)(3).

94. Rokt is also entitled to, without limitation, its actual losses, an award in the amount of Defendants' unjust enrichment caused by the misappropriation of Rokt's trade secrets, and exemplary damages based on Defendants' willful and malicious misappropriation pursuant to 18 U.S.C. § 1836(b)(3).

## COUNT II
### (Misappropriation of Trade Secrets Against All Defendants, New York Common Law)

95. Rokt repeats, realleges, and incorporates by reference each of the foregoing allegations as if fully set forth herein.

96.     As set forth above, Rokt owns various trade secrets critical to the success of its business, including, without limitation, the information described above, which constitute trade secrets under New York law.

97.     Rokt's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

98.     Rokt's trade secrets give it a competitive advantage over other companies in the advertising and e-commerce space who do not have access to that trade secret information.

99.     Rokt's trade secrets are valuable and crucial to its business functions and competitive position in its industry.

100.    The trade secrets that Defendants have misappropriated are of enormous potential value to Defendants and any competitor in the same industry. For example, they have allowed Defendants to replicate Rokt's platform and services and give Defendants an unfair competitive advantage in the industry, in comparative marketing, and in solicitation of Rokt's clients.

101.    Further use and disclosure of Rokt's secrets would risk destroying Rokt's competitive edge.

102.    Rokt has taken countless adequate steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets as described herein.

103.    By improvidently gaining access to, collecting, disclosing, and using Rokt's trade secrets to build a copycat platform and competing company, Defendants have used Rokt's trade secrets in breach of an agreement, confidence, or duty, or as a result of discovery by improper means, including theft, misrepresentation, and breaches and inducement of breaches of duties to maintain the secrecy of Rokt's trade secret information.

104.    As a direct and proximate result of Defendants' misappropriations, Rokt has suffered, continues to suffer, and will suffer in the future extensive, irreparable injury, loss of goodwill, harm to its reputation and business, and other injuries, including loss of clients and market share, for which there are no adequate remedy at law.  Rokt will suffer this harm unless and until Defendants are restrained from their unlawful conduct.

105.    As a direct and proximate result of Defendants' misappropriations, Rokt has suffered, continues to suffer, and will suffer in the future additional damages and costs, including lost profits and profits unjustly gained by Defendants' use of Rokt's trade secrets, in an amount to be proven at trial.

106.    Defendants committed their actions knowingly, deliberately, and in willful disregard of Rokt's rights.  Accordingly, Rokt is entitled to recover punitive damages in an amount to be determined at trial.

## <u>COUNT III</u>
### (Unfair Competition Against All Defendants, New York Law Common Law)

107.    Rokt repeats, realleges, and incorporates by reference each of the foregoing allegations as if fully set forth herein.

108.    Defendants have acted in bad faith and engaged in unfair competition against Rokt by, among other things, willfully breaching their obligations to maintain Rokt's confidential, propriety, and trade secret information and by misappropriating Rokt's confidential, proprietary, and trade secret information for their own benefit and competitive advantage.

109.    As Rokt recently discovered, Defendants have engaged in a scheme to wrongfully obtain and exploit the confidential, propriety, and trade secret information and competitive advantages belonging to Rokt.

110.    Nolz, on behalf of himself and AdsPostX, deceived Rokt into providing the confidential information by pretending that the information was for the benefit of the Groupon and Rokt relationship.  In reality, Nolz was working behind the scenes on AdsPostX at the same time and was using Rokt's confidential information to build the business before leaving Groupon.

111.    Similarly, Niyogi deceived Rokt into providing its confidential information relating to the Rokt One Platform by pretending that his downloading Rokt's Shopify app was for the purpose of monetizing three e-commerce sites when, in fact, he did so to access Rokt's confidential information for his and AdsPostX's benefit.

112.    Defendants have used and are continuing to use Rokt's confidential information to directly and unfairly compete against Rokt's business, including, *inter alia*, by contacting Rokt's clients and comparing the AdsPostX platform and services to Rokt's.

113.    Defendants' actions alleged herein constitute unfair competition.

114.    As a direct and proximate result of Defendants' unfair competition, Rokt has suffered, continues to suffer, and will suffer in the future extensive, irreparable injury, loss of goodwill, harm to its reputation and business, and other injuries, including loss of clients and market share, for which there are no adequate remedy at law.  Rokt will suffer this harm unless and until Defendants are restrained from their unlawful conduct.

115.    As a direct and proximate result of Defendants' unfair competition, Rokt has suffered, continues to suffer, and will suffer in the future additional damages in an amount to be proven at trial.

116.    Defendants committed their actions knowingly, deliberately, and willful in disregard of Rokt's rights.  Accordingly, Rokt is entitled to recover punitive damages in an amount to be determined at trial.

<u>**COUNT IV**</u>
**(Breach of Contract Against Niyogi, New York Common Law)**

117.    Rokt repeats, realleges, and incorporates by reference each of the foregoing allegations as if fully set forth herein.

118.    Niyogi entered into the Platform Services Agreement three separate times by signing up for Rokt's services under three different Shopify stores: CustomShirtCo, WinzosMerchShop, and Fonzy's Flippers.

119.    The Platform Services Agreement is a valid, binding, and enforceable agreement under New York law.

120.    Rokt has fully complied with its obligations under the Platform Services Agreement.

121.    The Platform Services Agreement, in relevant part, incorporates an Acceptable Use Policy and explicitly requires Niyogi to "keep this Agreement and the Confidential Information of the other party confidential and use it only for the purposes stated in this Agreement" and prohibits users from "access[ing] the Rokt Platform in order to build a competitive product or service, to build a product using similar ideas, features, functions or graphics of the Rokt Platform, or to copy any ideas, features, functions or graphics of the Rokt Platform."

122.    Niyogi intentionally and materially breached the Platform Services Agreement by, *inter alia*: (1) disclosing Rokt confidential information to AdsPostX, (2) using Rokt confidential information in ways likely to damage the interests of Rokt, and (3) using Rokt's confidential and trade secret information to develop a competing product and service to Rokt's.

123.    As a direct and proximate result of Niyogi's breaches of the Platform Services Agreement, Rokt has suffered, continues to suffer, and will suffer in the future extensive, irreparable injury, loss of goodwill, harm to its reputation and business, and other injuries,

including loss of clients and market share, for which there are no adequate remedy at law.  Rokt will suffer this harm unless and until Defendants are restrained from their unlawful conduct.

124.    As a direct and proximate result of Niyogi's breaches of the Platform Services Agreement, Rokt has suffered, continues to suffer, and will suffer in the future additional damages in an amount to be proven at trial.

## COUNT V
### (Fraud Against Nolz, New York Common Law)

125.    Rokt repeats, realleges, and incorporates by reference each of the foregoing allegations as if fully set forth herein.

126.    On numerous occasions, as detailed herein, Nolz made material misrepresentation of facts to Rokt in email and chat communications and during phone calls, when he expressly represented or implied that he was acting in his role as an employee of Groupon when he was requesting or receiving trade secrets and confidential information from Rokt.

127.    However, unbeknownst to Rokt, at the time, upon information and belief, Nolz was actually acting in his capacity as a co-founder of AdsPostX and seeking to collect information to build his business, entirely separate and apart from his role as an employee of Groupon.

128.    Nolz's misrepresentations were material because had Rokt known the truth, it would not have provided its trade secrets or confidential information to Nolz.

129.    During his communications with Rokt and requests for its trade secrets and confidential information, Nolz also omitted that that he was operating under any potential conflict of interest, that he was considering developing a competing business, that he had any interest in developing an advertising software beyond his work with Groupon and Rokt, or that he had disclosed or might disclose any Rokt information to any third party.

130.    Nolz was under a duty to disclose these material facts by virtue of his position at Groupon and Groupon and Rokt's ongoing relationship, which created a relationship of trust between Rokt and Nolz.

131.    Additionally, a duty to disclose arose based on Nolz's possession of knowledge regarding his motives and the purposes of his requests for Rokt's confidential and trade secret information that Rokt simply did not have.

132.    Nolz made these representations and omissions with the intent to defraud Rokt.

133.    Rokt relied on Nolz's materials misrepresentations and omissions and provided Nolz with access to its confidential, proprietary, and trade secret information when requested.

134.    Rokt's reliance was reasonable because Nolz was a high-level employee at Groupon, was Rokt's main point of contact with Groupon, and, upon information and belief, was subject to the strict confidentiality and non-disclosure provisions in the Rokt/Groupon Agreement.

135.    But for Rokt's reliance on Nolz's misrepresentations and omissions, Rokt would not have shared its trade secrets and confidential business information with Nolz and been irreparably injured as a result by Nolz's use of Rokt confidential information to directly compete with Rokt and solicit its clients.

136.     As a direct and proximate result of Nolz's fraudulent misrepresentations and omission, Rokt has suffered, continues to suffer, and will suffer in the future damages in an amount to be determined at trial.

137.    Nolz committed his actions knowingly, deliberately, and willful in disregard of Rokt's rights.  Accordingly, Rokt is entitled to recover punitive damages in an amount to be determined at trial.

## JURY DEMAND

Rokt respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Rokt respectfully requests that this Court enter judgment in its favor on all counts of this Complaint and grant Plaintiff the following relief:

1.      Preliminarily and permanently enjoin and restrain Defendants, their officers, subsidiaries, parents, divisions, agents, managing members, principal owners, servants, employees, attorneys, successors or assigns, and all persons or entities acting in concert or in participation with any of them, from directly or indirectly:

  a.      Accessing, copying, communicating, disclosing, sharing, or using any of Rokt's confidential, proprietary, and/or trade secret information in their possession;

  b.      Advertising, marketing, promoting, offering to sell, selling, or distributing AdsPostX advertising or e-commerce platforms, systems, or services that have been developed with the use of Rokt's confidential, proprietary, and/or trade secret information;

  c.      Criticizing or referring to Rokt's business or services in a negative light in any advertising, marketing, or promotional materials for AdsPostX;

  d.      Soliciting, attempting to solicit, or endeavoring to entice away from Rokt, whether directly or indirectly, any Rokt client, whether publicly disclosed or not, using Rokt's confidential, proprietary, and/or trade secret information;

e.      Discouraging, either directly or indirectly, any Rokt client from doing further business with Rokt;

f.      Being involved with the provision of service to, or otherwise having any business dealings with, any Rokt client in the course of any business concern that is in competition with Rokt's advertising and/or e-commence services;

g.      Further breaching any obligations, or causing another party to breach any obligations, under the Rokt Platform Ad-Serving Agreement; and

h.      Further breaching any obligations, or causing another party to breach any obligations, under Rokt's Platform Services Agreement.

i.      instructing, assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities referred to in foregoing sub-paragraphs (a through (i);

2.      Hold that Defendants have misappropriated Rokt's confidential and trade secret information in violation of the Defend Trade Secrets Act and New York common law, and that the misappropriation has been willful;

3.      Award damages, including exemplary and punitive damages to the extent allowed by law, in favor of Rokt and against Defendants in an amount to be determined at trial;

4.      Award Rokt pre-judgment and post-judgment interest, and its reasonable attorneys' fees, costs, and other expenses incurred in this action; and

5.      Award Rokt such other and further relief as the Court deems just and proper.

Dated: March 10, 2023
   New York, New York

Respectfully submitted,

DENTONS US LLP

By: <u>/s/ Tomasita L. Sherer</u>
   Tomasita L. Sherer
   Sara Gates
   1221 Avenue of the Americas
   New York, NY 10020-1089
   Phone: (212) 398-4871
   Fax: (212) 768 6800
   tomasita.sherer@dentons.com
   sara.gates@dentons.com

   Kirk R. Ruthenberg
   (*pro hac vice* admission pending)
   Nicholas H. Jackson
   (*pro hac vice* admission pending)
   1900 K Street, N.W.
   Washington, DC 20006
   Phone: (202) 496-7500
   Fax: (202) 496-7756

   *Attorneys for Plaintiffs Rokt Corp. and Rokt Pte Ltd.*