UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROKT CORP. and ROKT PTE LTD.,

                Plaintiffs,

v.

ADSPOSTX, INC., JON NOLZ, and SUROJIT NIYOGI,

                Defendants.

Civil Case No. _____

---

## DECLARATION OF ASHLEY FIRMSTONE

ASHLEY FIRMSTONE, being duly sworn, deposes and says:

1. I am Ashley Firmstone, a Senior Vice President at Rokt Corp., an indirect wholly owned subsidiary of Rokt Pte Ltd., both of which are Plaintiffs in the above-captioned action (collectively, "Rokt"). As such, I have personal and first-hand knowledge of the matters contained in this Declaration. For any matters that I do not have first-hand knowledge of, I reviewed and relied upon Rokt business records. If called as a witness, I could and would testify as to the statements made herein.

2. I submit this Declaration in support of Rokt's application for a preliminary injunction, pursuant to 18 U.S.C. § 1836(b)(3)(A) and Fed. R. Civ. P. 65(a), against defendants AdsPostX, Inc. ("AdsPostX"), Jon Nolz ("Nolz"), and Surojit Niyogi ("Niyogi," and collectively, with AdsPostX and Nolz, "Defendants") and for an order granting Rokt leave to take expedited discovery, pursuant to Fed. R. Civ. P. 26(d).

3. I have worked at Rokt for more eight years. In my role as Senior Vice President of Customer Success, I am in charge of owning and executing the strategy for Rokt's Customer Success team globally, commercial enablement, and overseeing client services for all of Rokt's

existing client relationships across all industries. As part of my job responsibilities, I ensure the business stays on target in terms of revenue delivery and growth goals for all existing accounts; I maintain relationships with all of Rokt's key clients at various stakeholder levels, attend virtual and in person meetings including quarterly business reviews with clients; I present opportunities for growth on accounts, as well as speak to innovation in Rokt's product and services in the market. Additionally, I manage our Customer Success team in terms of resourcing, planning, account allocation, and growth strategy.

        **A.    Background on Rokt, Its Trade Secrets and Confidential and Proprietary Business Information**

4. Founded in 2012, Rokt is a global leader in the e-commerce enablement and marketing technology industries, helping companies generate ancillary revenue on their e-commerce websites, acquire new customers at scale, and deepen relationships with existing customers.

5. Rokt uses its trade secrets to provide innovative services to clients in a variety of industries, including financial services, food and beverage, media and entertainment.

6. Among other services, Rokt operates a marketplace in which e-commerce companies provide personalized, relevant experiences to their customers through the display of third-party offers or advertisements from some of the world's largest advertisers and brands.

7. Rokt also helps e-commerce companies optimize their own first-party offers or upsells as well as directly cross-selling third-party products and services as part of one transaction.

8. For e-commerce sites, Rokt helps deliver substantial ancillary revenue, increasing their profit margin for each online transaction.

9. For advertisers, Rokt helps serve their offers to the right people, at the right time, *i.e.*, in the "transaction moment," when purchasers are receptive to additional offers.

10. Sensitive, confidential, and proprietary information constituting Rokt's trade secrets form the backbone of Rokt's business.

11. Such trade secrets include, *inter alia*, information regarding Rokt's most profitable advertisers; advertiser verticals and sub-verticals that Rokt works with and that a competitor would want to immediately target; the relative performance of different user experiences ("UX") and user interfaces ("UI") as measured and tested by Rokt for over a decade, which would allow a competitor to build its own UX and UI in reliance on Rokt's historical performance data; and the functionalities of Rokt's proprietary client portal, "One Platform."

12. Rokt has developed its innovative, cutting-edge technologies and business practices that have revolutionized the customer experience in e-commerce through its substantial investment in research and development over the past eleven years.

13. After over a decade of efforts to develop and grow its business including through substantial financial investments, Rokt won numerous awards for its innovative business and technological achievements.

14. Rokt recently attained a valuation of $2.4 billion, having built this lucrative business utilizing its confidential and trade secret information.

15. Rokt has consistently treated its trade secrets as confidential and Rokt has taken reasonable and adequate measures to maintain the confidentiality of its proprietary information.

16. For example, Rokt: (1) utilizes employee screening procedures, (2) requires employees to enter into non-disclosure and confidentiality agreements, (3) requires employees to properly categorize and label information as "public," "classified," or "confidential," (4) requires employees to undertake compulsory annual training on information security, privacy, and confidentiality, (5) restricts employees' access to confidential information based on their role and

through technical means, including, *inter alia*, password protection, and (6) restricts employees' ability to use storage devices that are not Rokt-approved.

17. For third parties, including select clients, partners, vendors, suppliers, and consultants, Rokt: (1) conducts due diligence on and assesses risks, *e.g.*, information security, for suppliers, (2) requires third parties to enter into agreements containing strict confidentiality provisions, *e.g.*, non-disclosure agreements or Rokt client agreements restricting access to and use of Rokt's confidential and trade secret information, and (3) restricts third parties' access to confidential information through technical means, including, *inter alia*, password protection.

18. Rokt also employs physical and technical barriers to confidential information at its offices and facilities to restrict access to visitors and third parties.

19. Rokt's proprietary information could not be easily garnered or duplicated by others in the industry, unless they also undertook years of effort and expense through trial and error, research and development, and the devotion of enormous financial and intellectual resources.

20. Any competitor who gained access to Rokt's trade secrets and unlawfully used them could jump-start a competing business.

**B.     Nolz and AdsPostX's Misappropriation of Rokt's Trade Secrets**

21. From April 2019 to at least October or December 2022, Nolz worked as an advertising director for Groupon, one of Rokt's trusted clients.

22. It is Rokt's understanding and belief that, in his role at Groupon, Nolz was likely subject to an employment agreement with Groupon containing confidentiality and non-disclosure provisions that prohibited him from using both Groupon's and Rokt's confidential information for non-Groupon related purposes.

23. In addition, during that time, both Groupon and Nolz, as an employee of Groupon, owed contractual confidentiality obligations to Rokt.

24. As per a Rokt Platform Ad-Serving Agreement ("Rokt/Groupon Agreement"), Groupon and Nolz, as an employee subject to the agreement, agreed to keep confidential and not to disclose Rokt's confidential information. They also agreed to use Rokt's confidential information solely in connection with Groupon's obligations or the services that Groupon was receiving under the Rokt/Groupon Agreement. A true and correct copy of the Rokt/Groupon Agreement, including the First Amendment to same, is attached hereto as **Exhibit A**.

25. Based on my review of relevant business records, while Nolz worked for Groupon, he expressly held himself out to Rokt as a trusted employee of Groupon who was working in the mutual interest of Groupon and Rokt to deploy Rokt's services on the Groupon platform, would maintain the confidentiality of Rokt confidential information, would abide by his confidentiality obligations, and would not use Rokt information for any purpose other than serving the interests of Groupon.

26. It is my understanding that, in reliance on these representations, Rokt shared confidential and trade secret information about Rokt's technology and business with Nolz. Nolz was also made aware that the information provided to him by Rokt about its technology and business was confidential and covered by the Rokt/Groupon Agreement.

27. Unbeknownst to Rokt until recently, however, Nolz was using Rokt's confidential and proprietary information to create AdsPostX, which he incorporated in June 2022, while he was employed at Groupon. A true and correct copy of the certificate of incorporation for AdsPostX, which Rokt obtained during its investigation of AdsPostX, is attached hereto as **Exhibit B**.

28. Indeed, public records show that at the same time that Nolz was employed by Groupon, accessing Rokt's confidential and trade secret information in connection with Groupon and Rokt's joint marketing efforts, he was building AdsPostX. *See id.* True and correct copies of print outs of Nolz's LinkedIn pages are attached hereto as **Exhibit C**.

29. It is my understanding that, without disclosing his interest in AdsPostX or that he was planning on forming a new business that would directly compete with Rokt, Nolz repeatedly requested and obtained information regarding how Rokt's proprietary technology operates, advertiser industry verticals and geographies in which Rokt was most successful, Rokt's strategies for delivering value to its clients, Rokt's processes for deploying its technology and services, and other Rokt confidential and trade secret information.

30. By virtue of his position and relationship of trust, Nolz received, *inter alia*, the following confidential and trade secret information from Rokt:

    a. The relative value driven by specific advertisers, verticals, and sub-verticals;

    b. The relative performance of different user experiences, *e.g.*, based on different designs, locations of logos, display and content of "call-to-action" buttons, among other variations;

    c. Rokt's pricing strategy;

    d. Rokt's rationale for its revenue share model, including Rokt's cost of goods sold and the relative percentage of profits received by Rokt and the e-commerce partner;

    e. Rokt's client list;

    f. Rokt's A/B testing and results of same regarding various strategies;

g. Rokt engagement rates with client's end customers by category of e-commerce partner, *e.g.*, engagement rates on food & beverage e-commerce sites v. retail;

h. The functionalities of Rokt's proprietary client portal "One Platform";

i. Customer acquisition goals of advertisers, including those referred by Groupon;

j. Rokt's strategy for "closing the loop" or attributing conversions on an advertiser's page to Rokt and a specific source partner;

k. Rokt's strategy for managing changes to supply and demand dynamics in its two-sided marketplace, including how Rokt accounts for seasonality;

l. Rokt's relative revenue performance in various international and domestic markets;

m. The operation of Rokt's proprietary "Smart Bidding" technology which adjusts advertisers' bid amounts to have their offers shown to certain customers to maximize the likely value to the advertisers;

n. Rokt's use of non-industry standard reporting metrics to demonstrate to clients the value Rokt helps deliver on their e-commerce sites;

o. Rokt's methodology for running discrepancy checks between Rokt measurement of revenue performance versus client's measurement of revenue performance;

p. Rokt's quality score calculations which determine ad ranking in Rokt's proprietary real time bidding system, *i.e.*, they help determine which advertisement is shown to a user;

q. The advertiser verticals and sub-verticals that Rokt determined over time and in consultation with clients must be whitelisted, meaning advertisers in these vertical and sub-verticals will not run on a partner site unless a partner affirmatively opts in;

r. Rokt's legal and business positioning with respect to US, EU, and Japanese privacy and marketing laws;

s. The value of specific components of the Rokt software development kit ("SDK"), which enables third party offers to be shown in iOS and Android apps;

t. Rokt's strategy for launching new partner products or campaigns, *e.g.*, in-app offers, at appropriate percentage of web traffic and ramping up, balancing revenue goals against quality assurance;

u. Rokt's checklist for launching new advertisers on the marketplace;

v. Rokt's anomaly detection capabilities;

w. Rokt's channel sales / referral strategy, including a step plan for specific activities; and

x. Groupon's revenue performance on Rokt's technology.

31. Nolz accessed and received this information under the guise of benefitting the Rokt and Groupon relationship, but as Rokt only recently discovered, Nolz built AdsPostX based upon Rokt's misappropriated confidential and trade secret information.

**C.  Niyogi and AdsPostX's Misappropriation of Trade Secrets**

32. Around the same time, and unbeknownst to Rokt until recently, Nolz's business partner and AdsPostX co-founder Niyogi was also involved in the scheme. A true and correct

copy of Niyogi's LinkedIn page, which indicates that he has served as Chief Product Officer and co-founder of AdsPostX since April 2022, is attached hereto as **Exhibit D**.

33.  In August and September 2022, Niyogi signed up for Rokt's services three times, purporting to be a merchant-customer under three different Shopify stores: CustomShirtCo, WinzosMerchShop, and Fonzy's Flippers.

34.  In signing up for these three accounts, Niyogi agreed to abide by Rokt's Platform Services Agreement to access and use Rokt's Shopify App and the Rokt Platform, including Rokt's proprietary client portal called, "One Platform." A true and correct copy of these Rokt Platform Services Agreements are attached hereto as **Exhibit E**.

35.  Thereafter, Niyogi had access to:

   a.  the functionalities of One Platform;

   b.  the functionalities of Rokt's Shopify App; and

   c.  Rokt's use of non-industry standard reporting metrics, among other confidential and trade secret information.

36.  The Platform Services Agreement, which incorporates the Acceptable Use Policy, requires users to "keep this Agreement and the Confidential Information of the other party confidential and use it only for the purposes stated in this Agreement" and bars users from, *inter alia*, "access[ing] the Rokt Platform in order to build a competitive product or service, to build a product using similar ideas, features, functions or graphics of the Rokt Platform, or to copy any ideas, features, functions or graphics of the Rokt Platform." Ex. D §§ 8.8(i), § 11.2.

37.  Notably, it is my understanding that none of Niyogi's Shopify stores have generated any revenue using Rokt's services, which indicates that Niyogi created the accounts as a ruse for the purpose of improperly accessing Rokt's confidential and trade secret information.

38. Rokt discovered in mid-February 2023 that Niyogi was connected to AdsPostX and had signed up for Rokt's services.

39. The Platform Services Agreement remains in effect and Rokt fully complied with its obligations under the agreement.

### D. Defendants' Unfair Competition and Targeting of Rokt's High-Value Clients

40. To the best of Rokt's knowledge, in late February 2023, AdsPostX officially went live with its first e-commerce customer on its copycat platform.

41. Rokt's technologies and business practices were not available in the marketplace before being deployed by Rokt, and no other company other than Rokt was able to develop such an approach until AdsPostX recently launched its business.

42. Defendants could not have developed these competitive services in a fraction of the time without misappropriating Rokt's trade secrets and relying upon Rokt's decade of investment, research, development, and testing.

43. For example, Defendants targeted several of Rokt's top performing advertisers, relying on performance data that Nolz was privy to during his time at Groupon.

44. AdsPostX then launched its product on at least one Rokt client site utilizing a UX and UI virtually identical to Rokt's, relying on UX/UI experimentation results that were shared with Nolz when he was purporting to act on behalf of Groupon.

45. Defendant AdsPostX publicly declared it intends to compete directly with Rokt. In recent marketing materials, it announced that it launched its platform "to bring optionality, controls and flexibility to a space currently led by Rokt." A true and correct copy of AdsPostX's press release is attached hereto as **Exhibit F**.

46. AdsPostX also brazenly compared its services to Rokt's in its marketing materials, openly criticizing Rokt's offerings.

47. Defendants' marketing materials further demonstrate that Defendants used and disclosed Rokt's trade secrets and confidential information.

48. For example, in a screenshot of which is shown below, Defendants claim that Rokt's "Advertiser mix skews to 2-3 top spenders (bids driving revenue not targeting/relevancy)."



49. Without admitting the truth or accuracy of this statement, it is clear that this type of information about Rokt is neither publicly available nor readily ascertainable and could have only been obtained by one of the select individuals who have access to Rokt's trade secrets and confidential information.

50. Rokt's investigations also revealed that Defendants used Rokt's performance data, which Nolz obtained at Groupon while subject to confidentiality obligations, to target Rokt's high-value clients and prospective partners.

51. Without disclosing the names of non-public clients, Rokt recently discovered that Defendants targeted at least two current confidential e-commerce partners and several current advertisers.

52. To Rokt's knowledge, Defendants are on at least two, soon to be three, e-commerce clients' websites and Defendants' public announcements and marketing to date shows that they are trying to aggressively expand and supplant Rokt in the market.

53. The ongoing conduct of Defendants, which will further impair the value of Rokt's trade secrets and confidential information, demonstrates that Rokt faces irreparable harm unless the Court enjoins AdsPostX from further using or disclosing Rokt's trade secrets.

54. Defendants' actions have caused and will continue to cause irreparable harm to Rokt through the loss and disclosure of its invaluable trade secrets, damage to its market-leading position, and impairment of Rokt's valuable reputation that it has spent more than a decade building.

55. Monetary damages would be insufficient because Rokt has no way to reliably measure or quantify the full harm that Defendants have caused.

56. Absent injunctive relief, Defendants will continue to use Rokt's misappropriated trade secrets and confidential information to unfairly compete with Rokt, solicit its clients, and tarnish Rokt's reputation in the marketplace.

57. Rokt therefore brings this action for misappropriation of trade secrets, unfair competition, breach of contract, and fraudulent misrepresentations and omissions and respectfully requests that the Court grant its application for preliminary injunction against Defendants and grant Rokt leave to take expedited discovery.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of March, 2023.

DocuSigned by:

*Ashley Firmstone*

5DF80A4CD8A24A7...

ASHLEY FIRMSTONE

13