UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ROKT CORP. and ROKT PTE LTD.,

        Plaintiffs,

    -v-                                No.  1:23-CV-02081-LTS

ADSPOSTX, INC., JON NOLZ, and
SUROJIT NIYOGI,

        Defendants.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

        Rokt Corp. and Rokt Pte Ltd. (collectively, "Plaintiffs" or "Rokt") bring this action against AdsPostX, Inc. ("AdsPostX"), Jon Nolz ("Nolz"), and Surojit Niyogi ("Niyogi" and, collectively, "Defendants"), asserting claims for misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836 et seq., and New York state common law, as well as New York common law claims of unfair competition, breach of contract, and fraud.  (Docket entry no. 1 ("Complaint" or "Compl.").)  The Court has jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1367.

        Pending before the Court is Defendants' motion to dismiss the Complaint in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted.  (See docket entry no. 49 (the "Motion").)  The Court has reviewed the parties' submissions thoroughly and, for the following reasons, Defendants' Motion is granted in part and denied in part.

BACKGROUND

The following facts are drawn from the Complaint and documents appended thereto.  Relevant procedural background information can be found in the Court's September 5, 2025 order granting in part and denying in part Rokt's motion for a preliminary injunction. (Docket entry no. 128 (the "Preliminary Injunction Order").)

Founded in 2012, Rokt is a leading e-commerce enablement and marketing technology company, which "help[s] companies generate ancillary revenue on their e-commerce websites, acquire new customers at scale, and deepen relationships with existing customers." (Compl. ¶ 21.)  As relevant to the instant litigation, Rokt offers post-transaction advertising services, whereby an advertisement offer is served immediately following a consumer purchase. (Id. ¶¶ 23-26.)  Rokt has developed its innovative technologies and business practices through substantial investment in research and development over the past eleven years, and alleges that these technologies and practices were not available in the marketplace before being deployed by Rokt and that no other company had developed such an approach prior to the events of the instant litigation.  (Id. ¶¶ 28-29.)  Rokt works with both advertisers, i.e., the businesses that pay to advertise through a Rokt placement, and e-commerce companies, i.e., the businesses that host the Rokt advertising placement on their websites.  (Id. ¶¶ 25-26.)  While Rokt has a number of well-known clients, including Ticketmaster, Poshmark, and AMC Theaters, the identities of the majority of its clients are maintained as confidential.  (Compl. ¶ 27.)

Rokt alleges that sensitive, confidential, and proprietary information constituting Rokt's trade secrets form the backbone of its business, which trade secrets include, inter alia: (1) information regarding the most profitable advertisers, advertiser verticals, and advertiser sub-verticals that Rokt works with and that a competitor would want to immediately target; (2) the

relative performance of different user experiences ("UX") and user interfaces ("UI") as measured and tested by Rokt for over a decade, which would allow a competitor to build its own UX and UI in reliance on Rokt's historical performance data; and (3) the functionalities of Rokt's proprietary client portal, "One Platform." (Id. ¶ 31.) Rokt further alleges that it has taken reasonable and appropriate measures to maintain the confidentiality of its valuable proprietary information, including by requiring third parties to enter agreements containing strict confidentiality provisions, e.g., non-disclosure agreements or client agreements restricting access to and use of Rokt's confidential and trade secret information, as well as restricting third party access to confidential information through "technical means," e.g., document password protection. (Id. ¶ 36.)

From April 2019 to at least October or December 2022, Defendant Nolz worked as an advertising director for Groupon, one of Rokt's valued clients, and was Rokt's main point of contact with Groupon. (Id. ¶ 38.) In this role, Nolz was allegedly subject to two separate agreements that imposed confidentiality and nondisclosure obligations:

(1) an agreement between Rokt and Groupon, whereby Groupon engaged Rokt's services, which commenced August 18, 2015 (id. ¶ 40; docket entry no. 10-1 (the "Rokt/Groupon Agreement"));

(2) an employment agreement with Groupon (Compl. ¶ 39).

By virtue of Nolz's position at Groupon, his relationship of trust with Rokt, contractual confidentiality obligations, and his representations that the information he received and requested would be used for Groupon and Rokt's joint marketing efforts, Rokt alleges that Nolz received, inter alia, the following twenty-four categories of confidential and trade secret information:

(a) The relative value driven by specific advertisers, verticals, and sub-verticals;

(b) The relative performance of different user experiences, _e.g._, based on different designs, locations of logos, display and content of "call-to-action" buttons, among other variations;

(c) Rokt's pricing strategy;

(d) Rokt's rationale for its revenue share model, including Rokt's cost of goods sold and the relative percentage of profits received by Rokt and the ecommerce partner;

(e) Rokt's client list;

(f) Rokt's A/B testing and results of same regarding various strategies;

(g) Rokt engagement rates with client's end customers by category of ecommerce partner, _e.g._, engagement rates on food & beverage e-commerce sites v. retail;

(h) The functionalities of Rokt's proprietary client portal "One Platform";

(i) Customer acquisition goals of advertisers, including those referred by Groupon;

(j) Rokt's strategy for "closing the loop" or attributing conversions on an advertiser's page to Rokt and a specific source partner;

(k) Rokt's strategy for managing changes to supply and demand dynamics in its two-sided marketplace, including how Rokt accounts for seasonality;

(l) Rokt's relative revenue performance in various international and domestic markets;

(m) The operation of Rokt's proprietary "Smart Bidding" technology, which adjusts advertisers' bid amounts to have their offers shown to certain customers to maximize the likely value to the advertisers;

(n) Rokt's use of non-industry standard reporting metrics to demonstrate to clients the value Rokt helps deliver on their e-commerce sites;

(o) Rokt's methodology for running discrepancy checks between Rokt['s] measurement of revenue performance versus client's measurement of revenue performance;

(p) Rokt's quality score calculations which determine ad ranking in Rokt's proprietary real time bidding system, _i.e._, they help determine which advertisement is shown to a user;

(q) The advertiser verticals and sub-verticals that Rokt determined over time and in consultation with clients must be whitelisted, meaning advertisers in these vertical and sub-verticals will not run on a partner site unless a partner affirmatively opts in;

(r) Rokt's legal and business positioning with respect to US, EU, and Japanese privacy and marketing laws;

     (s)   The value of specific components of the Rokt software development kit ("SDK"), which enables third party offers to be shown in iOS and Android apps;

     (t)   Rokt's strategy for launching new partner products or campaigns, <u>e.g.</u>, in-app offers, at appropriate percentage of web traffic and ramping up, balancing revenue goals against quality assurance;

     (u)   Rokt's checklist for launching new advertisers on the marketplace;

     (v)   Rokt's anomaly detection capabilities;

     (w)   Rokt's channel sales / referral strategy, including a step plan for specific activities; and

     (x)   Groupon's revenue performance on Rokt's technology.

(<u>Id.</u> ¶¶ 42-43, 47-48, 53-54.)  Rokt alleges, upon information and belief, that Nolz knew that the foregoing trade secrets and proprietary information provided to him by Rokt were confidential, because Nolz was made aware that the information provided to him by Rokt about its technology and business was confidential and covered by the Rokt/Groupon Agreement.  (<u>Id.</u> ¶ 48.)

     During his period of employment with Groupon, and while receiving Rokt's confidential and trade secret information in connection with that employment, Rokt alleges, Nolz was building a business to compete with Rokt, <u>i.e.</u>, Defendant AdsPostX.  (<u>Id.</u> ¶¶ 49-50.) AdsPostX was incorporated in June 2022 and, upon information and belief, went live with its first e-commerce customer on its "copycat" platform in February 2023.  (<u>Id.</u> ¶¶ 49, 65.)  Rokt alleges that Nolz built AdsPostX based upon Rokt's misappropriated confidential and trade secret information, and that, using the misappropriated trade secrets and confidential information, Defendants are now competing directly with Rokt by offering effectively the same platform and services, soliciting Rokt's clients and prospective partners, and disparaging and drawing critical comparisons to Rokt in marketing materials.  (<u>Id.</u> ¶¶ 7, 54, 68-77.)  Rokt alleges that AdsPostX could not have developed its competitive services in a fraction of the time that it took Rokt to do so without its misappropriation of Rokt's trade secrets.  (<u>Id.</u> ¶ 29.)

Rokt further alleges that Nolz repeatedly reached out to Rokt representatives to request confidential, proprietary, and trade secret information, purportedly in his capacity as a Groupon employee to further Groupon's interests, but that he instead was requesting and accessing that information for the purpose of creating his competitor business, AdsPostX. (Id. ¶¶ 38-54.) In making these requests, and at all material times, Rokt further alleges, Nolz did not disclose his plans to develop AdsPostX or his interest in AdsPostX once that entity had been established. (Id. ¶ 51.) Rokt alleges that the foregoing actions constitute fraud, in that Nolz made material misrepresentations regarding both his intent and the purposes for which he was requesting Rokt's confidential, proprietary, and trade secret information, and that Nolz was under a duty to disclose these material facts by virtue of his position at Groupon and Rokt's ongoing relationship with that company, and because he knew that Rokt was not privy to his intent and the purposes for which he was requesting such information, all of which activity was undertaken by Nolz with the intent to defraud Rokt. (Id. ¶¶ 126-131.)

Rokt additionally alleges that, around the same time of Nolz's alleged improper conduct, and also unbeknownst to Rokt until recently, AdsPostX co-founder and Chief Product Officer Niyogi was involved in the purported scheme. (Id. ¶ 55.) Specifically, Rokt alleges that, in August and September 2022, Niyogi signed up for Rokt's services three separate times, purporting to be a merchant-customer under three Shopify[1] store names: CustomShirtCo, WinzosMerchShop, and Fonzy's Flippers. (Id. ¶ 57.) In signing up for these accounts, Niyogi agreed to abide by Rokt's Platform Services Agreement to access and use Rokt's Shopify App and the Rokt Platform,[2] including Rokt's proprietary client portal called "One Platform." (Id. ¶

---

[1]    Shopify is a non-party that hosts third-party storefronts. (See Compl. ¶¶ 57-63.)

[2]    The Platform Services Agreement defined the "Rokt Platform" as "the technology platform owned, controlled and/or operated by Rokt, made available to Partner as a

58.)  Niyogi agreed to the Platform Services Agreement each time he signed up for Rokt's

Shopify services by clicking a box presented to him within his Shopify Account Portal that

indicated his acceptance to all provisions of the Agreement.  (See docket entry no. 10-5 ("PSA

Agreements") at 2, 14, 26.)  The Platform Services Agreement stipulated that parties to the

Agreement would "keep [the] Agreement and the Confidential Information of the other party

confidential and use it only for purposes stated in [the] Agreement," subject to the remainder of

the Agreement's confidentiality provisions.  (PSA Agreements at 8 § 11.2, 11.4, 20 § 11.2, 11.4,

32 § 11.2, 11.4.)  The Agreement also incorporated an Acceptable Use Policy, which provided

that users agreed not to, inter alia, "access the Rokt Platform in order to build a competitive

product or service, to build a product using similar ideas, features, functions or graphics of the

Rokt Platform, or to copy any ideas, features, functions or graphics of the Rokt Platform[.]"  (Id.

at 6 § 8.8(i)(vii), 18 § 8.8(i)(vii), 30 § 8.8(i)(vii).)  Thus, Rokt alleges, Niyogi had access to three

categories of trade secret: (1) the functionalities of One Platform; (2) the functionalities of Rokt's

Shopify App; and (3) Rokt's use of non-industry standard reporting metrics, among other

confidential and trade secret information.  (Compl. ¶ 59.)

      Rokt alleges that, at the time it filed its Complaint, none of Niyogi's Shopify

stores generated any revenue using Rokt's services, "even though generating revenue is the only

---

hosted service, and used to provide Rokt Ecommerce under this Agreement and generally
to Network Members, which incorporates, without limitation, the Rokt Widget, the
Licensed Software, the Rokt Ecommerce Application (as defined in clause 8.7), the
Marketplace Advertiser platform and network, Rokt's transaction marketing engine, the
Rokt websites, the web portal through which Partner may access its Rokt account, and all
software, scripts, data, files, methods, APIs or functionality therein and thereto enabling
the provision of such Services[.]"  (Docket entry no. 10-5 ("PSA Agreements") at 11 §
15, 23 § 15, 35 § 15.)  The "Rokt Ecommerce Application" was further defined as the
"Rokt application entitled 'Rokt Ecommerce' available on the Shopify App Store[.]"  (Id.
at 6 § 8.7, 18 § 8.7, 30 § 8.7.)

legitimate reason that a user would use Rokt's Shopify application."  (<u>Id.</u> ¶ 61.)  Rokt further alleges, upon information and belief, that none of these Shopify stores have active websites or are operational, and that Niyogi instead created the three "dummy" Shopify accounts as a ruse for the sole purpose of gaining improper access to Rokt's confidential and trade secret information, which he then collected, shared, and disclosed to AdsPostX.  (<u>Id.</u> ¶¶ 62-64.)  Rokt asserts that the foregoing conduct amounts to intentional and material breach of the Platform Services Agreement.  (<u>Id.</u> ¶ 122.)

Following Rokt's filing of a motion for a preliminary injunction by order to show cause, Defendants moved to dismiss the Complaint in its entirety.  The Motion was thereafter fully briefed, and the case was transferred to the undersigned.

D<span style="font-variant:small-caps">ISCUSSION</span>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation omitted).  This requirement is satisfied when the factual content in the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," <u>id.</u> (citation omitted), but a pleading that contains only "naked assertions" or "a formulaic recitation of the elements of a cause of action" does not suffice.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 557 (2007) (citation omitted).  "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."  <u>ASARCO LLC v. Goodwin</u>, 756 F.3d 191, 198 (2d Cir. 2014) (citation omitted).

The Court addresses Rokt's five claims in turn.

Misappropriation of Trade Secrets (Counts I & II)

           To state a claim under the DTSA, a plaintiff must allege "(1) the existence of a trade secret . . .  and (2) misappropriation of that secret[.]"  Ahmad v. Day, No. 20-CV-4507-JMF, 2023 WL 3847144, at *6 (S.D.N.Y. June 6, 2023) (citation and internal quotation marks omitted); 18 U.S.C. § 1836(b)(1) (Westlaw through P.L. 119-34).  "Trade secret" is broadly defined to include "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized" so long as (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3) (Westlaw through P.L. 119-34).

           "Misappropriation" for purposes of the DTSA is similarly broadly construed.  It is defined by the statute to include, in relevant part:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> > (i) used improper means to acquire knowledge of the trade secret;
> >
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
> >
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;
> > >
> > > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > >
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

18 U.S.C. § 1839(5) (Westlaw through P.L. 119-34).  "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Id. § 1839(6)(A).

Similarly, under New York law, "a plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  Intertek Testing Servs., N.A., Inc. v. Pennisi, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020) (internal quotation marks and citation omitted); see also Free Country Ltd. v. Drennen, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) ("The requirements for showing a misappropriation of a trade secret are similar under state and federal law.").  Precisely because "the requirements are similar, courts have found that a complaint sufficiently pleading a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law."  Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P., No. 21-CV-00038-MKV, 2022 WL 4072935, at *13 (S.D.N.Y. Sept. 2, 2022) (internal quotation marks and citation omitted).

"Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity."  Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., 68 F.4th 792, 800-801 (2d Cir. 2023) (citations omitted). "The question of whether or not [information] is a trade secret is generally a question of fact." A.F.A Tours, Inc. v. Whitchurch, 937 F.2d 82, 89 (2d Cir. 1991) (citations omitted); Syntel, 68 F.4th at 801.

Rokt alleges that Nolz received and misappropriated twenty-four categories of trade secret information (Compl. ¶ 53), and that Niyogi received and misappropriated three categories of trade secret information (id. ¶ 59).  Defendants assert that Rokt's trade secret

misappropriation claims premised on these categories fail for four primary reasons: (1) Rokt's trade secret allegations are too conclusory; (2) "many, if not all" of Rokt's alleged trade secrets are publicly available; (3) Rokt fails to establish that it took adequate steps to protect the secrecy of the alleged trade secret information; and (4) even if Rokt had sufficiently alleged a protected trade secret, it fails to plausibly allege misappropriation by the Defendants. (Docket entry no. 50 ("Defs. Mem.") at 1-2, 8.) For the following reasons, the Court finds each such argument to be largely unavailing.

   First, Rokt has pleaded its categories of trade secret with sufficient specificity so as to place Defendants on notice of the information allegedly misappropriated and to allow the Court to evaluate whether it has stated a claim with respect to each category of purportedly disclosed trade secret information, save for one: "Rokt's A/B testing and results of same regarding various strategies" (Compl. ¶ 53(f)). This category, as pleaded, is too generalized to adequately apprise Defendants or the Court of the information that Rokt is referencing. Additionally, to the extent Rokt seeks to premise its claims on additional, unidentified categories of alleged trade secret information, such pleading is improper. (See id. ¶ 53 (alleging that "Nolz received, inter alia, the following confidential and trade secret information"); id. ¶ 59 (alleging that Niyogi received three specified categories of information, "among other confidential and trade secret information")); see also, e.g., Emazing Lights LLC v. De Oca, No. SACV 15-1561-AG, 2016 WL 3658945, at *2 (C.D. Cal. Jan. 7, 2016) (finding trade secret allegations to lack "meaningful limit" where, inter alia, trade secret examples were preceded by an "includ[ing], but . . . not limited to" proviso, because "[a]ny piece of information could potentially be labeled as a trade secret under this definition").

The remainder of the identified categories are, however, sufficient at this stage to support a trade secret misappropriation claim; the categories are adequately descriptive and often provide examples or definitional language to make clear the kinds of information Rokt is referencing.  (See, e.g., Compl. ¶ 53(b), (g), (k), (m), (p)); cf., e.g., Elsevier Inc. v. Doctor Evidence, LLC, No. 17-CV-5540-KBF, 2018 WL 557906, at *4, 6 (S.D.N.Y. Jan. 23, 2018) (explaining that a trade secret claimant must do more "than simply list general categories of information").  Courts also routinely find the types of information listed by Rokt to constitute trade secret information.  See, e.g., Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.), 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law."); Cross Media Mktg. Corp. v. Nixon (In re Cross Media Mktg. Corp.), No. 06-CV-4228-MBM, 2006 WL 2337177, at *4 (S.D.N.Y. Aug. 11, 2006) ("A customer list that contains information such as the identities and preferences of client contacts is a protectable trade secret." (citations omitted)); SimplexGrinnell LP v. Integrated Sys. & Power, Inc., 642 F. Supp. 2d 167, 198 (S.D.N.Y. 2009) ("'New York courts have recognized that computer software, or programs, can be a trade secret.'" (citation omitted)).  Moreover, Rokt includes a number of allegations demonstrating how the listed categories of information "derive independent economic value" from being kept secret and not readily ascertainable through proper means.  Specifically, Rokt alleges that this information "forms the backbone of its business" (Compl. ¶¶ 3, 30), that it has spent over a decade investing in research and development, as well as building client relationships, in order to make its technology desirable and profitable (id. ¶¶ 28-29, 32-33), that it takes reasonable and appropriate measures to maintain the confidentiality of this information (id. ¶ 34), and that the information would essentially give a competitor an unfair leg up in offering similar services, because a competitor would be able to,

e.g., quickly replicate Rokt's platform and services and gain an unfair competitive edge in the industry, comparative marketing, and solicitation of Rokt's clients. (See, e.g., id. ¶¶ 100-101); cf., e.g., Lawrence v. NYC Med. Practice, P.C., No. 18-CV-8649-GHW, 2019 WL 4194576, at *5 (S.D.N.Y. Sept. 3, 2019) (finding trade secret allegations to be insufficient where claimants listed general categories of information and "fail[ed] to include any allegations supporting the various factors that define the 'contours' of a trade secret").

Next, Defendants argue, proffering a number of printouts they represent are from Rokt's public-facing website, that "[m]any of Rokt's alleged trade secrets are readily ascertainable by accessing Rokt's website or products." (Defs. Mem. at 12.) Accordingly, Defendants argue that such information cannot constitute protectable trade secret information. (Id. at 11-13). As Rokt notes, however, consideration of the exhibits proffered by Defendants is inappropriate at this stage of litigation (docket entry no. 54 ("Pls. Mem.") at 9-10), given that Defendants are proffering these documents for the truth of the matter asserted, i.e., that the websites contain the same information that Rokt alleges constitutes its trade secrets, and that this information was made available to the public. See, e.g., Uni-Systems, LLC v. United States Tennis Ass'n, 350 F. Supp. 3d 143, 162 n.9 (E.D.N.Y. 2018) (declining to take judicial notice of any materials proffered from defendant's website "as the information appears to be proffered for the truth of the matter asserted on the site" (citations omitted)). Because Rokt disputes that its alleged trade secret information is public and asserts that Defendants' exhibits improperly identify the "small subset of trade secrets" that Defendants assert have been made public (Pls. Mem. at 10-12), these factual disputes will be more properly addressed in a summary judgment, rather than motion to dismiss, posture. As noted above, the well-pleaded facts alleged in the

Complaint must be taken as true in evaluating a motion to dismiss a complaint for failure to state a claim upon which relief may be granted.

For this reason and in view of the measures Rokt alleges that it employed to maintain the confidentiality of its valuable proprietary information when sharing any such information with third parties, like Nolz on behalf of Groupon, including confidentiality agreements, like the Rokt/Groupon Agreement[3] to which Rokt alleges that Nolz was subject (Compl. ¶¶ 36(b), 42), and the use of technical means, including, inter alia, password protection (id. ¶ 36(c)), the Court also finds Defendants' argument that Rokt did not take sufficiently reasonable measures to protect the secrecy of its alleged trade secret information provided to Nolz to be unavailing.  See, e.g., ExpertConnect, L.L.C. v. Fowler, No. 18-CV-4828-LGS, 2019 WL 3004161, at *1 (S.D.N.Y. July 10, 2019) (finding efforts to protect trade secret information sufficiently alleged where, inter alia, plaintiff required confidentiality and non-disclosure agreements and made trade secret accessible only through "password protected entry points").

As to the trade secret information allegedly provided to Niyogi, and drawing all inferences in Rokt's favor, the Court similarly finds that the measures employed by Rokt to protect that information—i.e., the Platform Services Agreements,[4] which included confidentiality provisions prohibiting disclosure and limiting the use of such information to purposes stated in Agreements (PSA Agreements at 8 §§ 11.2, 11.4, 20 §§ 11.2, 11.4, 32 §§ 11.2, 11.4)—as pleaded in the Complaint were reasonable.  Courts have found agreements containing nondisclosure provisions for confidential information to be sufficient to support trade secret

---

[3]     Rokt appended this contract to its Complaint.  A redacted version is filed at docket entry no. 1-1, and an unredacted version at docket entry no. 10-1.

[4]     Rokt also appended the Platform Service Agreements to its Complaint.  Redacted versions of the Agreements are filed at docket entry no. 1-5, and unredacted versions are filed at docket entry no. 10-5.

allegations, see, e.g., Turret Labs USA, Inc. v. CargoSprint, LLC, No. 21-952, 2022 WL 701161, at *2-3 (2d Cir. Mar. 9, 2022) (discussing import of confidentiality and nondisclosure agreements for computer software functionality alleged to be trade secret); AD Lightning Inc. v. Clean.io, Inc., No. 19-CV-7367-JPO, 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020) (noting that "reasonable measures" to protect trade secret can include, inter alia, the use of confidentiality agreements (citation omitted)), including those presented in the form of a so-called "clickwrap agreement,"[5] as here, Elepreneurs Holdings, LLC v. Benson, No. 4:21-CV-00026, 2021 WL 410001, at *2–3, 6 (E.D. Tex. Feb. 5, 2021), modified in part, 2021 WL 734977 (E.D. Tex. Feb. 25, 2021) (finding plaintiff had established prima facie case of trade secret misappropriation in relevant part where trade secrets were protected by clickwrap agreement); cf. Broker Genius, Inc. v. Zalta, 280 F. Supp. 3d 495, 521-22 (S.D.N.Y. 2017) (discussing use of clickwrap agreement with skepticism but ultimately finding lack of confidentiality provision altogether to be dispositive of trade secret inquiry); Zabit v. Brandometry, LLC, 540 F. Supp. 3d 412, 424-25 (S.D.N.Y. 2021) (noting that courts have been skeptical of confidentiality agreements standing alone where other allegations undercut assertion of trade secret, e.g., in case before the court where plaintiffs conceded that they had repeatedly

---

[5]    A "clickwrap" agreement is "a type of agreement that allows a consumer to assent to the terms of a contract by selecting an 'accept' button on the web site and if the consumer does not accept the terms of the agreement, the web site will not complete the transaction."  Elepreneurs Holdings, LLC v. Benson, No. 4:21-CV-00026, 2021 WL 410001, at *3 (E.D. Tex. Feb. 5, 2021), modified in part, 2021 WL 734977 (E.D. Tex. Feb. 25, 2021) (internal quotation marks modified and citation omitted).  The PSA Agreements were presented to Niyogi as clickwrap agreements.  See discussion supra pp. 6-7; (see also PSA Agreements at 2, 14, 26 ("BY ACCEPTING THIS ROKT PLATFORM SERVICES AGREEMENT . . . BY CLICKING A BOX PRESENTED TO YOU WITHIN YOUR SHOPIFY ACCOUNT PORTAL INDICATING YOUR ACCEPTANCE, YOU AGREE TO ALL OF THE PROVISIONS OF THIS AGREEMENT . . . ." (emphasis added)); Pls. Mem. at 13-14.)

licensed the disputed index without requiring that the licensees keep any information confidential).

The fact that Rokt does not allege that it marked any information disclosed to Niyogi as "confidential," "proprietary," or "trade secret" is likewise not dispositive, given the broad definition of "Confidential Information" under the Rokt Platform Services Agreements, which does not require such annotations to render materials protected and which is plausibly pleaded to encompass the alleged trade secret information in dispute. (See Compl. ¶¶ 53, 59; PSA Agreements at 8 § 11.1, 20 § 11.1, 32 § 11.1 (defining "Confidential Information" to mean, inter alia, "all information about the disclosing party's business or activities that is proprietary and confidential," which included, but was not limited to, all information marked or designated by the disclosing party as "confidential" or "proprietary" at the time of disclosure); see also id. at 12 § 16.11(h), 24 § 16.11(h), 36 § 16.11(h) ("**Interpretation.** In this Agreement and for all purposes . . . the word 'includes,' 'including' and similar expressions are not words of limitation.").)

Finally, the Court finds that Rokt has plausibly alleged misappropriation of the trade secret information purportedly received by Defendants (Compl. ¶¶ 53, 59), having alleged, inter alia, that Rokt's technology was developed over a lengthy period of time—eleven years— through substantial investment in research and development, that its technologies and business practices were not available in the marketplace before being deployed by Rokt, that no other company had developed an approach similar to Rokt's until AdsPostX, and that AdsPostX could not have developed its competitive services in a fraction of the time that it took Rokt without misappropriating and relying on Rokt's trade secrets. (Id. ¶¶ 28-29, 67.) These allegations support plausibly the inference that Defendants used or in some way relied upon, i.e.,

misappropriated, Rokt's trade secret information that was allegedly disclosed to Nolz or Niyogi

when they developed AdsPostX.  See Town & Country Linen Corp. v. Ingenious Designs LLC,

556 F. Supp. 3d 222, 280 (S.D.N.Y. 2021) ("In trade secret misappropriation cases where

Defendants created products allegedly utilizing the trade secrets, copying can be establishing by

showing that a defendant had access to the alleged trade secrets and that there is a substantial

similarity between the original product which embodied those trade secrets and the alleged copy

created by the defendant." (internal quotation marks and citation omitted)).

      Rokt augments these allegations by further proffering that, inter alia: (1) while he

was employed with Groupon, Nolz requested access to and otherwise used Rokt's confidential,

proprietary, and trade secret information as part of his efforts to develop AdsPostX and that such

conduct violated confidentiality obligations imposed upon him (Compl. ¶¶ 41-52), (2) Niyogi

gained access to Rokt's confidential trade secret information through surreptitious means to use

such information for AdsPostX development (id. ¶¶ 55-64), and (3) Defendants have both

targeted and advertised to Rokt clientele using Rokt's confidential and trade secret information

(id. ¶¶ 69, 73-77).  See, e.g., Lodging Sols. LLC v. Miller, No. 19-CV-10806-AJN, 2020 WL

6875255, at *3 (S.D.N.Y. Nov. 23, 2020) (finding that, "while the mere allegation that

[defendant] accessed trade secret information may not be enough to support an allegation of

acquisition, the unusual circumstances under which [defendant] is alleged to have accessed the

information are"); Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., No. 15-CV-

211-LGS-RLE, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (finding misappropriation

claim to be plausibly stated where defendant-counterclaimants alleged that the plaintiff

downloaded defendant-counterclaimants' trade secret information for plaintiff's own use and

financial gain in breach of an agreement); Balance Point Divorce Funding LLC v. Scrantom, 978

F. Supp. 2d 341, 353 (S.D.N.Y. 2013) (finding that a plausible inference of use was raised where "knowledge of [the trade secret] would enable [the defendant] inevitably to better compete with [the plaintiff]").

In short, Rokt's Complaint plausibly establishes claims for misappropriation of trade secrets under the DTSA and New York law, to the extent its claims are premised on trade secret information specifically described in the Complaint (see Compl. ¶¶ 53(a)-(e), 53(g)-(x), 59).  The Motion is therefore denied to the extent it seeks dismissal of these claims.  The Motion is, however, granted to the extent it seeks dismissal of the claims premised on the information alleged in paragraph 53(f) of the Complaint, "Rokt's A/B testing and results of same regarding various strategies" (id. ¶ 53(f)), and types of information that are not described in the Complaint.

Count III: Unfair Competition

Generally, "New York common law recognizes two theories of common-law unfair competition: palming off and misappropriation." Kid Car NY, LLC v. Kidmoto Techs. LLC, 518 F. Supp. 3d 740, 760 (S.D.N.Y. 2021) (internal quotation marks and citations omitted).  Rokt's claims allege misappropriation.  To plead such a claim, the plaintiff must allege "facts giving rise to a plausible inference that the defendant, acting in bad faith, misappropriated the plaintiff's labor and expenditures to gain a commercial advantage or maliciously interfered with the plaintiff's good will." LivePerson, Inc. v. 24/7 Customer, Inc., 83 F. Supp. 3d 501, 519 (S.D.N.Y. 2015) (citation omitted).  "The essence of the misappropriation theory is not just that the defendant has reaped where it has not sown, but that it has done so in an unethical way and thereby unfairly neutralized a commercial advantage that the plaintiff achieved through honest labor[.]" E.J. Brooks Co. v Cambridge Sec. Seals, 31 N.Y.3d 441, 449 (N.Y. 2018) (internal quotation marks and citation omitted).  "New York's law of unfair competition is a 'broad and

flexible doctrine that depends more upon the facts set forth . . . than in most causes of action.'" <u>Telecom Int'l Am., Ltd. v. AT&T Corp.</u>, 280 F.3d 175, 197 (2d Cir. 2001) (citation omitted); <u>see</u> <u>also Linkco, Inc. v. Fujitsu Ltd.</u>, 230 F. Supp. 2d 492, 500 (2002) ("[T]he Second Circuit has made clear that unfair competition is not limited to the categories of infringement that have been described in New York's pattern jury instructions or recognized by courts, but instead encompasses a broad range of conduct.").

       For substantially the reasons described in connection with Rokt's trade secrets claims—namely, the alleged taking and use of confidential and trade secret information by Defendants and for the benefit of AdsPostX—the Court finds that Rokt has sufficiently pleaded a claim for unfair competition under New York law.  (See Compl. ¶ 68 ("In addition to creating a copycat platform, as Rokt recently learned, Defendants also used Rokt's performance data, which Nolz obtained at Groupon while subject to confidentiality obligations, to target and solicit Rokt's high-value clients and prospective partners."); <u>id.</u> ¶ 74 ("Defendants' marketing materials further demonstrate that Defendants used and disclosed Rokt's trade secrets and confidential information."); <u>see</u> <u>also</u> <u>Paz Sys. v. Dakota Group Corp.</u>, 514 F. Supp. 2d 402, 409-10 (E.D.N.Y. 2007) (finding that the same alleged acts that supported a claim for misappropriation of trade secrets also supported a claim for unfair competition where plaintiff's customers were solicited by certain defendants using plaintiff's confidential and improperly accessed files).  Moreover, for the reasons discussed in the Court's Preliminary Injunction Order, the Court finds that Rokt's claim for unfair competition is not duplicative of its claims for misappropriation of trade secrets at this pleading stage.  (<u>See</u> Preliminary Injunction Order at 35-36.)  The Motion is accordingly denied to the extent it seeks dismissal of Count III, Rokt's unfair competition claim.

Count IV: Breach of Contract

To state a claim for breach of contract under New York law, a plaintiff must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Ellington Credit Fund Ltd. v. Select Portfolio Servicing Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)). Here, the parties dispute only whether the third element of Rokt's claim has been satisfied: breach of the Rokt Platform Services Agreement by Niyogi. (See Defs. Mem. at 21.)

Drawing all inferences in Rokt's favor, the Court finds that Rokt has plausibly alleged Niyogi's breach of the Platform Services Agreement. Rokt alleges that, at the time Niyogi downloaded the Rokt Shopify App and agreed to the Platform Services Agreement, he had begun his position as co-founder and Chief Product Officer at AdsPostX, and that none of the three Shopify stores for which he had downloaded the App ever generated revenue, nor, upon information and belief, have active websites or are operational. (Compl. ¶¶ 56-61 (calling the three stores "dummy Shopify accounts").) These allegations plausibly support the inference that Niyogi downloaded the Rokt Shopify App "in order to build a competitive product or service . . . [,] build a product using similar ideas, features, functions or graphics of the Rokt Platform . . . or to copy . . . ideas, features, functions or graphics of the Rokt Platform" (PSA Agreements at 6 § 8.8(i)(vii), 18 § 8.8(i)(vii), 30 § 8.8(i)(vii)), i.e., to help develop AdsPostX's services in violation of the Platform Services Agreements, rather than to generate revenue for any of the three stores. In doing so, Niyogi would have at least had to disclose information he had obtained to AdsPostX, in further violation of the Platform Services Agreement. (See PSA Agreements at 8 §§ 11.2, 11.4, 20 §§ 11.2, 11.4, 32 §§ 11.2, 11.4) (prohibiting disclosure of the Agreement and disclosure and improper use of the "Confidential Information" of the other party).)

Defendants make an additional, cursory argument in the alternative that the claim against Niyogi is improperly asserted against him in his personal capacity, rather than against AdsPostX, "on whose behalf Niyogi was allegedly accessing the Rokt Shopify App and Rokt Platform." (Defs. Mem. at 22-23.) As noted by Rokt, however, it is a basic principle of agency law that, where an agent is acting on behalf of a principal in entering a contract and does not disclose that principal, the agent will become personally liable under the contract. See, e.g., Stonhard v. Blue Ridge Farms, LLC, 980 N.Y.S.2d 507, 509-10 (N.Y. App. Div., 2nd Dep't 2014). Under New York law, "[a] principal is considered to be 'disclosed' if, at the time of a transaction conducted by an agent, the other party to the contract had notice that the agent was acting for the principal and of the principal's identity[.]" Id. at 509 (citations omitted). Given that (1) Niyogi personally entered into each of the Platform Services Agreements without identifying his affiliation with AdsPostX and used email addresses not associated with AdsPostX (see Platform Services Agreements at 2, 14, 26; Compl. ¶ 57 (alleging that Niyogi signed up for Rokt's services purporting to be a merchant-customer under three different Shopify stores, none of which was AdsPostX)), and (2) there are no other allegations suggesting that Rokt was aware that Niyogi was acting on behalf of AdsPostX, there is no basis to find, based on the face of the Complaint and the documents appended thereto, that Niyogi adequately disclosed that he was an agent working on behalf of a principal, AdsPostX. The Court therefore finds that Rokt has adequately pleaded its claim against Niyogi in his personal capacity.

Count V: Fraud

Under New York law, the elements of a fraud claim consist of "a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of

the other party on the misrepresentation or material omission, and injury.'"  Pasternack v. Lab'y

Corp. of Am. Holdings, 27 N.Y.3d 817, 828 (2016) (internal quotation marks and citations

omitted).  While Rule 9(b) of the Federal Rules of Civil Procedure requires that the

circumstances of fraud be pleaded with particularity, plaintiffs may allege states of mind,

including intent and knowledge, generally.  O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d

674, 676 (2d Cir. 1991).  Moreover, despite Rule 9(b)'s heightened pleading requirements,

"allegations may be based on information and belief when facts are peculiarly within the

opposing party's knowledge."  Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990)

(citations omitted).  Plaintiffs may not make conclusory statements about intent, but it is

sufficient for plaintiffs to plead facts that give rise to a "strong inference of fraudulent intent,"

for example by "alleging facts to show that defendants had both motive and opportunity to

commit fraud."  S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir.

1996) (internal citation omitted); O'Brien, 936 F.2d at 676.

   Rokt's Complaint can be read to support theories of fraud premised on Nolz's

alleged misrepresentations as well as his alleged material omission.  (See Compl. ¶¶ 126-28

(misrepresentation); id. ¶¶ 129-31 (material omission).)  Rokt's main theory of fraud at issue in

Defendants' Motion—fraud by misrepresentation—is premised on Rokt's allegations that Nolz

requested confidential and trade secret information from Rokt under the guise of needing such

information in connection with his employment at Groupon but, in reality, was seeking to

collect such information to build his competitor business, AdsPostX.[6]  (Complaint ¶¶ 125-127.)

---

[6]   Defendants' opening brief appears to have only addressed Rokt's theory of fraud
premised on Nolz's alleged misrepresentation, although the briefing does cite to portions
of the Complaint discussing Rokt's theory of fraud premised on material omission.  (See
Defs. Mem. at 25.)  Defendants made a more specific, but still cursory, argument on reply
as to the material omission theory (docket entry no. 56 ("Reply Mem.") at 10), which, to

Rokt alleges that, had it been aware of this misrepresentation, it would not have disclosed the requested information to Nolz.  (Id. ¶ 128.)

Defendants argue that Rokt's allegations concerning Nolz's conduct "amount to nothing more than unsupported conclusions and unwarranted inferences that do not rise to the level of particularity required to plausibly plead a material misrepresentation" (Defs. Mem. at 25; see also docket entry no. 56 ("Reply Mem.") at 10), but ignore Rokt's numerous specific allegations, including the particular dates and contents of correspondence between Nolz and Rokt employees in which Nolz allegedly requested confidential and trade secret information (Compl. ¶¶ 43-47), as well as Rokt's allegations concerning Nolz's motive for misrepresentation, i.e., building a competitive business (id. ¶¶ 49-50), and the alleged infeasibility of Nolz having successfully built a competing business without reliance on this deceptively obtained information (id. ¶¶ 29, 67).  These specific allegations, which sufficiently support a circumstantial case of intentional misrepresentation (Pls. Mem. at 23), plausibly state a claim for fraud.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted only insofar as it seeks dismissal of Rokt's misappropriation of trade secret claims, Counts I and II, to the extent they are premised on types of trade secret information not described

---

the extent it was properly raised, nevertheless fails.  Defendants' reply briefing asserts that the Complaint "does not allege that Nolz failed to disclose information in violation of any duty to disclose, such as a fiduciary relationship, partial or ambiguous statement, or knowledge that Rokt was operating under a mistaken understanding" (id.), as required for a material omission theory of fraud, but Defendants fail to contend with explicit allegations to that effect in the Complaint.  (See Compl. ¶ 130 (alleging that Nolz was under a duty to disclose the material facts at issue "by virtue of his position at Groupon and Groupon and Rokt's ongoing relationship"); id. ¶ 131 (alleging that a duty to disclose also arose "based on Nolz's possession of knowledge regarding his motives and the purposes of his requests for Rokt's confidential and trade secret information that Rokt simply did not have").)

in the Complaint and the information referred to in paragraph 53(f) of the Complaint, "Rokt's A/B testing and results of same regarding various strategies[.]" The Motion is denied in all other respects.

   Should Rokt wish to seek leave to amend the Complaint to remedy the deficiencies identified above with respect to its claims for misappropriation of trade secrets, Counts I and II, Rokt must file a motion within 30 days from the date of this Memorandum Order and Opinion. The motion must comply with all federal, state, and local rules, including S.D.N.Y. Local Civil Rule 15.1. Should Rokt fail to file a timely motion for leave to amend, the designated portions of Counts I and II shall be dismissed with prejudice.

   The Clerk of Court is respectfully directed to file this Memorandum Opinion and Order under seal with access to selected parties only pending further order of the Court, in order to afford the parties an opportunity to request redactions prior to public filing, to the extent such redaction is necessary and consistent with governing law. See, e.g., Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119-20 (2d Cir. 2006). A separate order directing the parties to meet, confer and report to the Court regarding any requested redactions will follow entry of this Memorandum Opinion and Order.

   Docket entry no. 49 is resolved. This case will be referred to the designated magistrate judge for general pretrial management, which includes settlement.

   SO ORDERED.

Dated: New York, New York
   September 5, 2025

          /s/ Laura Taylor Swain
          LAURA TAYLOR SWAIN
          Chief United States District Judge