UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ROKT CORP. and ROKT PTE LTD.,

        Plaintiffs,

    -v-                           No.  1:23-CV-02081-LTS

ADSPOSTX, INC., JON NOLZ, and
SUROJIT NIYOGI,

        Defendants.

-------------------------------------------------------x

<u>M</u>EMORANDUM <u>O</u>PINION AND <u>O</u>RDER <u>G</u>RANTING <u>P</u>RELIMINARY <u>I</u>NJUNCTION[*]

        Rokt Corp. and Rokt Pte Ltd. (collectively, "Plaintiffs" or "Rokt") bring this action against AdsPostX, Inc. ("AdsPostX"),[1] Jon Nolz ("Nolz"), and Surojit Niyogi ("Niyogi" and, collectively, "Defendants"), asserting claims for misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836 <u>et seq.</u>, and New York state common law, as well as New York common law claims of unfair competition, breach of contract, and fraud.  (Docket entry no. 1 ("Complaint" or "Compl.").)  The Court has jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1367.

        Pending before the Court is Plaintiffs' motion for a preliminary injunction,

---

[*]      This Memorandum Opinion and Order was issued in unredacted form on September 5, 2025.  The parties were given the opportunity to propose redactions consistent with the Court's prior protective orders and controlling authority.  <u>See</u>, <u>e.g.</u>, <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 126-27 (2d Cir. 2006).  This redacted version reflects the narrowly tailored redactions as to which the parties made the requisite showing of the heightened need for confidentiality.

[1]      According to Defendants, AdsPostX, Inc. is now doing business as MomentScience.  (<u>See</u> docket entry no. 127 at 1 n.2.)  AdsPostX has not requested that the caption of the instant case be amended to reflect the change.

seeking relief based on each cause of action asserted in the Complaint apart from Plaintiffs' fraud claim.  (See docket entry no. 7.)  The Court has reviewed the parties' submissions carefully and, for the following reasons, the motion is granted in part and denied in part.  This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law for the purposes of Federal Rule of Civil Procedure 52.

<u>B</u>ACKGROUND

The following facts are drawn from the Complaint, documents appended thereto or incorporated by reference and, where indicated, documents proffered by the parties in connection with briefing on the instant motion following expedited discovery.  <u>See</u> <u>New York v. Trump</u>, 767 F. Supp. 3d 44, 56 (S.D.N.Y. 2025) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." (internal quotation marks and citations omitted)).

Founded in 2012, Rokt is a leading e-commerce enablement and marketing technology company, which "help[s] companies generate ancillary revenue on their e-commerce websites, acquire new customers at scale, and deepen relationships with existing customers." (Docket entry no. 9 ("Firmstone Decl.") ¶ 4.)  As relevant to the instant litigation, Rokt offers post-transaction advertising services, whereby an advertisement offer is served immediately following a consumer purchase.  (<u>Id.</u> ¶¶ 6-9.)  Rokt has developed its innovative technologies and business practices through substantial investment in research and development over the past eleven years, and recently attained a valuation of $2.4 billion.  (<u>Id.</u> ¶¶ 12-13.)  Rokt's technologies and practices were not available in the marketplace before being deployed by Rokt, and, prior to the events of the instant litigation, no other company had developed such an approach.  (<u>Id.</u> ¶ 41.)  Rokt works with both advertisers, <u>i.e.</u>, the businesses that pay to advertise

through a Rokt placement, and "publishers," i.e., the businesses that host the Rokt advertising placement and receive a share of the revenue paid to Rokt to show advertisers' offers on their websites or applications ("apps").  (Docket entry no. 84 ("Firmstone Second Supp. Decl.") ¶ 5.) While Rokt has a number of publicly-disclosed clients, including Ticketmaster, Poshmark, and AMC Theaters, the identities of the majority of its clients are maintained as confidential. (Compl. ¶ 27.)

       Rokt alleges that sensitive, confidential, and proprietary information constituting Rokt's trade secrets form the backbone of its business, which trade secrets include, inter alia: (1) information regarding the most profitable advertisers, advertiser verticals, and advertiser sub-verticals that Rokt works with and that a competitor would want to immediately target; (2) the relative performance of different user experiences ("UX") and user interfaces ("UI") as measured and tested by Rokt for over a decade, which would allow a competitor to build its own UX and UI in reliance on Rokt's historical performance data; and (3) the functionalities of Rokt's proprietary client portal, "One Platform."  (Id. ¶¶ 30-31; Firmstone Decl. ¶¶ 10-11.)  Rokt further alleges that it has taken reasonable and appropriate measures to maintain the confidentiality of its valuable proprietary information, including by requiring third parties to enter agreements containing strict confidentiality provisions, e.g., non-disclosure agreements or client agreements restricting access to and use of Rokt's confidential and trade secret information, as well as restricting third party access to confidential information through "technical means," e.g., password protection.  (Compl. ¶¶ 34-37; Firmstone Decl. ¶¶ 15-18.)

       From April 2019 to at least October or December 2022, Defendant Nolz worked as an advertising director for Groupon, one of Rokt's valued clients, and acted as a point of contact between Rokt and Groupon.  (Firmstone Decl. ¶¶ 21, 25-26; docket entry no. 31-1 ("Nolz

Decl.") ¶¶ 4, 6-8.)  In this role, Nolz was subject to three separate agreements that imposed

confidentiality obligations:

> (1)  an agreement between Rokt and Groupon, whereby Groupon engaged Rokt's services, which commenced August 18, 2015 (docket entry no. 10-1 (the "Rokt/Groupon Agreement"));
>
> (2)  a confidentiality agreement for his employment with Groupon, signed by Nolz on April 24, 2019 (docket entry no. 66-2 at 2-10); and
>
> (3)  a separate referral agreement that Groupon entered into with Rokt, ███████ ███████████████████████████████████████████████████████ ████████████████████████████████ which was signed by a representative from Groupon on January 20, 2020 (docket entry no. 66-1 at 55-60 (identifying Nolz ███████████████████████████████████ ████████).

By virtue of Nolz's position at Groupon, his relationship of trust with Rokt,

contractual confidentiality obligations, and his representations that the information he received

and requested would be used for Groupon and Rokt's joint marketing efforts, Rokt alleges that

Nolz received, <u>inter alia</u>, the following twenty-four categories of confidential and trade secret

information:

> (a)  The relative value driven by specific advertisers, verticals, and sub-verticals;
>
> (b)  The relative performance of different user experiences, <u>e.g.</u>, based on different designs, locations of logos, display and content of "call-to-action" buttons, among other variations;
>
> (c)  Rokt's pricing strategy;
>
> (d)  Rokt's rationale for its revenue share model, including Rokt's cost of goods sold and the relative percentage of profits received by Rokt and the ecommerce partner;
>
> (e)  Rokt's client list;
>
> (f)  Rokt's A/B testing and results of same regarding various strategies;
>
> (g)  Rokt engagement rates with client's end customers by category of ecommerce partner, <u>e.g.</u>, engagement rates on food & beverage e-commerce sites v. retail;
>
> (h)  The functionalities of Rokt's proprietary client portal "One Platform";

(i)    Customer acquisition goals of advertisers, including those referred by Groupon;

(j)    Rokt's strategy for "closing the loop" or attributing conversions on an advertiser's page to Rokt and a specific source partner;

(k)    Rokt's strategy for managing changes to supply and demand dynamics in its two-sided marketplace, including how Rokt accounts for seasonality;

(l)    Rokt's relative revenue performance in various international and domestic markets;

(m)    The operation of Rokt's proprietary "Smart Bidding" technology, which adjusts advertisers' bid amounts to have their offers shown to certain customers to maximize the likely value to the advertisers;

(n)    Rokt's use of non-industry standard reporting metrics to demonstrate to clients the value Rokt helps deliver on their e-commerce sites;

(o)    Rokt's methodology for running discrepancy checks between Rokt['s] measurement of revenue performance versus client's measurement of revenue performance;

(p)    Rokt's quality score calculations which determine ad ranking in Rokt's proprietary real time bidding system, i.e., they help determine which advertisement is shown to a user;

(q)    The advertiser verticals and sub-verticals that Rokt determined over time and in consultation with clients must be whitelisted, meaning advertisers in these vertical and sub-verticals will not run on a partner site unless a partner affirmatively opts in;

(r)    Rokt's legal and business positioning with respect to US, EU, and Japanese privacy and marketing laws;

(s)    The value of specific components of the Rokt software development kit ("SDK"), which enables third party offers to be shown in iOS and Android apps;

(t)    Rokt's strategy for launching new partner products or campaigns, e.g., in-app offers, at appropriate percentage of web traffic and ramping up, balancing revenue goals against quality assurance;

(u)    Rokt's checklist for launching new advertisers on the marketplace;

(v)    Rokt's anomaly detection capabilities;

(w)    Rokt's channel sales / referral strategy, including a step plan for specific activities; and

(x)    Groupon's revenue performance on Rokt's technology.

(Complaint ¶ 53; Firmstone Decl. ¶ 30.)  Rokt alleges, upon information and belief, that Nolz knew that the foregoing trade secrets and proprietary information provided to him by Rokt were confidential, because Nolz was made aware that the information provided to him by Rokt about its technology and business was confidential and covered by the Rokt/Groupon Agreement. (Compl. ¶ 47; Firmstone Decl. ¶ 26.)

During his period of employment with Groupon, and while allegedly receiving Rokt's confidential and trade secret information in connection with that employment, Nolz was building a business to compete with Rokt, i.e., Defendant AdsPostX.  (Compl. ¶¶ 49-50; Firmstone Decl. ¶ 28; Nolz Decl. ¶¶ 12-17.)  AdsPostX was incorporated in June 2022, but Nolz took steps to establish the company as early as April 2022.  (Firmstone Decl. ¶ 27; Nolz Decl. ¶¶ 15-17.)  Nolz has acted as the Chief Executive Officer of AdsPostX since its founding.  (Nolz Decl. ¶ 1.)

Rokt alleges that Nolz built AdsPostX based upon Rokt's misappropriated confidential and trade secret information, and that, using the misappropriated trade secrets and confidential information, Defendants are now competing directly with Rokt by offering effectively the same platform and services, soliciting Rokt's clients and prospective partners, and disparaging and drawing critical comparisons to Rokt in marketing materials.  (Compl. ¶¶ 7, 54, 65-77; see also Firmstone Decl. ¶¶ 41-52.)  Upon information and belief, AdsPostX went live with its first e-commerce customer on its "copycat" platform in February 2023.  (Compl. ¶ 65; Firmstone Decl. ¶ 40.)

Rokt additionally alleges that, around the same time of Nolz's alleged improper conduct, and also unbeknownst to Rokt until recently, AdsPostX co-founder and Chief Product Officer Niyogi was involved in the purported scheme.  (Compl. ¶ 55; Firmstone Decl. ¶ 32;

docket entry no. 31-21 ("Niyogi Decl.") ¶ 1.)  Specifically, in August and September 2022,

Niyogi signed up for Rokt's services three separate times, purporting to be a merchant-customer

under three Shopify[2] store names: CustomShirtCo, WinzosMerchShop, and Fonzy's Flippers.

(Firmstone Decl. ¶¶ 33-34; Niyogi Decl. ¶¶ 27-28.)  In signing up for these accounts, Niyogi

agreed to abide by Rokt's Platform Services Agreement to access and use Rokt's Shopify App

and the Rokt Platform,[3] including Rokt's proprietary client portal called "One Platform."

(Niyogi Decl. ¶¶ 58-59; Firmstone Decl. ¶ 34.)  Niyogi agreed to the Platform Services

Agreement each time he signed up for Rokt's Shopify services by clicking a box presented to

him within his Shopify Account Portal that indicated his acceptance to all provisions of the

Agreement.  (See docket entry no. 10-5 ("PSA Agreements") at 2, 14, 26; Firmstone Decl. ¶ 34;

Niyogi Decl. ¶¶ 59-60.)  The Platform Services Agreement stipulated that parties to the

Agreement would "keep [the] Agreement and the Confidential Information of the other party

confidential and use it only for purposes stated in [the] Agreement," subject to the remainder of

the Agreement's confidentiality provisions.  (PSA Agreements at 8 § 11.2, 11.4, 20 § 11.2, 11.4,

32 § 11.2, 11.4.)  The Agreement also incorporated an Acceptable Use Policy, which provided

that users agreed not to, inter alia, "access the Rokt Platform in order to build a competitive

---

[2]     Shopify is a non-party that hosts third-party storefronts.  (See Compl. ¶¶ 57-63.)

[3]     The Platform Services Agreement defined the "Rokt Platform" as "the technology
platform owned, controlled and/or operated by Rokt, made available to Partner as a
hosted service, and used to provide Rokt Ecommerce under this Agreement and generally
to Network Members, which incorporates, without limitation, the Rokt Widget, the
Licensed Software, the Rokt Ecommerce Application (as defined in clause 8.7), the
Marketplace Advertiser platform and network, Rokt's transaction marketing engine, the
Rokt websites, the web portal through which Partner may access its Rokt account, and all
software, scripts, data, files, methods, APIs or functionality therein and thereto enabling
the provision of such Services[.]"  (Docket entry no. 10-5 ("PSA Agreements") at 11 §
15, 23 § 15, 35 § 15.)  The "Rokt Ecommerce Application" was further defined as the
"Rokt application entitled 'Rokt Ecommerce' available on the Shopify App Store[.]"  (Id.
at 6 § 8.7, 18 § 8.7, 30 § 8.7.)

product or service, to build a product using similar ideas, features, functions or graphics of the Rokt Platform, or to copy any ideas, features, functions or graphics of the Rokt Platform[.]"  (Id. at 6 § 8.8(i)(vii), 18 § 8.8(i)(vii), 30 § 8.8(i)(vii).)  Thus, Rokt alleges, Niyogi had access to three categories of trade secret: (1) the functionalities of One Platform; (2) the functionalities of Rokt's Shopify App; and (3) Rokt's use of non-industry standard reporting metrics, among other confidential and trade secret information.  (Compl. ¶ 59; Firmstone Decl. ¶ 35.)

Rokt alleges that, at the time it filed its Complaint, none of Niyogi's Shopify stores generated any revenue using Rokt's services, "even though generating revenue is the only legitimate reason that a user would use Rokt's Shopify application."  (Compl. ¶ 61; Firmstone Decl. ¶ 37.)  Rokt further alleges, upon information and belief, that none of these Shopify stores have active websites or are operational, and that Niyogi instead created the three "dummy" Shopify accounts as a ruse for the sole purpose of gaining improper access to Rokt's confidential and trade secret information, which he then collected, shared, and disclosed to AdsPostX. (Compl. ¶¶ 62-64; Firmstone Decl. ¶ 37.)  Rokt asserts that the foregoing conduct amounts to intentional and material breach of the Platform Services Agreement.  (Compl. ¶ 122.)

On March 10, 2023, Rokt initiated the instant action, asserting five claims: (1) misappropriation of trade secrets in violation of the DTSA, as against all Defendants; (2) misappropriation of trade secrets in violation of New York state common law, as against all Defendants; (3) unfair competition, as against all Defendants; (4) breach of contract, as against Niyogi; and (5) fraud, as against Nolz.  (See generally id.)  By order to show cause, Rokt also moved for preliminary injunctive relief as to its first four claims and for leave to conduct expedited discovery.  (See docket entry no. 7.)  Rokt specifically requested that the Court enjoin Defendants from:

(1) Accessing, copying, communicating, disclosing, sharing, or using any of Rokt's confidential, proprietary, and/or trade secret information in their possession, custody, or control, including without limitation: [the 24 categories of confidential and trade secret information allegedly provided to Nolz by Rokt (Compl. ¶ 53)];

(2) Advertising, marketing, promoting, offering to sell, selling, or distributing AdsPostX advertising or e-commerce platforms, systems, or services that have been developed with the use of Rokt's confidential, proprietary, and/or trade secret information;

(3) Criticizing or referring to Rokt's business or services in a negative light in any advertising, marketing, or promotional materials for AdsPostX;

(4) Soliciting, attempting to solicit, or endeavoring to entice away from Rokt, whether directly or indirectly, any Rokt client, whether publicly disclosed or not, using Rokt's confidential, proprietary, and/or trade secret information;

(5) Discouraging, either directly or indirectly, any Rokt client from doing further business with Rokt;

(6) Being involved with the provision of service to, or otherwise having any business dealings with, any Rokt client in the course of any business concern that is in competition with Rokt's advertising and/or e-commerce services;

(7) [intentionally omitted as duplicative];

(8) Further breaching any obligations, or causing another party to breach any obligations, under the Rokt Platform Ad-Serving Agreement, executed by Rokt and Groupon, Inc. on or about August 18, 2015, including the First Amendment to same, executed by Rokt and Groupon, Inc. on or about January 18, 2018;

(9) Further breaching any obligations, or causing another party to breach any obligations, under Rokt's Platform Services Agreement, executed by Niyogi on or about August 21, 2022, August 22, 2022, and September 12, 2022, and

(10) Aiding or abetting any other person or entity engaging in or performing any of the acts referred to in paragraphs 1 through 9 above.

(Id.)

On March 29, 2023, the Court entered the requested order to show cause, setting a hearing date for April 17, 2023, and granted Rokt's request for expedited discovery as specified therein. (Docket entry no. 21 ("OSC").) Following the April 17, 2023 hearing (see docket entry

no. 46 ("Apr. Hrg. Tr.")), Judge Jennifer H. Rearden, who was then presiding over the case,

granted Defendants' request for reciprocal expedited discovery and set a schedule for

supplemental briefing "based exclusively on material derived from [the parties'] expedited

discovery" (docket entry nos. 43, 57). The parties subsequently submitted two rounds of

supplemental briefing: the first set, which concerned the material derived from expedited

discovery, and a second set regarding AdsPostX's purported hiring of a former Rokt employee.

(See docket entry no. 127 ("Jt. Stat. Rpt.") at 5-6; docket entry no 89.)

Expedited Discovery

      In the first round of supplemental briefing, Rokt proffered more than 500 pages of

materials produced by Rokt, Groupon, and Defendants during expedited discovery, and reiterated

the categories of trade secrets that it allegedly owns, including:

> (1) the relative value driven by specific advertisers, verticals, and sub-verticals; (2) the relative performance of different user experiences ("UXs"), e.g., based on different designs, locations of logos, and display and content of "call-to-action" buttons; (3) Rokt's pricing strategy; (4) Rokt's rationale for its revenue share model, including Rokt's cost of goods sold and the relative per-centage of profits distributed between Rokt and an e-commerce partner; (5) Rokt's non-public clients; and (6) Rokt's engagement rates with clients' end customers by category of e-commerce partner.

(Docket entry no. 62 ("Pls. Supp. Mem.") at 6 (citing various portions of proffered

record); see also docket entry no. 66 ("Sherer Decl.").) From the documents produced,

Rokt points to a number of examples that it asserts demonstrate Nolz's misappropriation

of Rokt's trade secrets, including:

- **April 24, 2022:** Nolz created a business plan for AdsPostX, which █

███████████████████████████████████████████ [(Docket entry no. 66-2 at 16-23 ("Nolz Business Plan").]

- **April 27, 2022**: Nolz used his personal Yahoo email to access certain alleged trade secret documents of Rokt's that were only properly accessible through his Groupon account, such as a document entitled ████████████████████ [(Docket entry no. 66-3 at 5; docket entry no. 66-4 at 2-8).]

- **May 25, 2022**: John Abraham of AdsPostX asked Nolz for "the list of Rokt sites" so he could "profile and mirror." [(Docket entry no. 66-4 at 12.)] Nolz responded that he sent it over, referencing a separate email, and said "[t]hese are their top 10 pubs." See id. Nolz apparently was referring to Rokt's top 10 publishers—information that he would have only received during his employment at Groupon subject to his confidentiality obligations.

- **June 30, 2022**: Nolz emailed ███████████████ (a venture capital fund) regarding pitching the business as a competitor to Rokt and said that he could add plenty of points about Rokt, including that Rokt's ██████████████████████████████████████████████ [(Docket entry no. 66-6 at 43-45.)]

- **July 12, 2022**: Nolz, from his personal Yahoo email account, sent to his AdsPostX email account a copy of Rokt's May 2022 Quarterly Business Review ("QBR"), which included ███████████████ ███████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ [Docket entry no. 66-5 at 16; docket entry no. 66-6 at 2-30).]

- **July 27, 2022**: Nolz emailed ███████████ [, an advertising partner of AdsPostX], regarding his plan to orchestrate Groupon's engagement of AdsPostX and removal of Rokt, disclosing that ████████████████ ████████████████████████████████████████████ [(Docket entry no. 66-7 at 23.)].

(See Pls. Supp. Mem. at 6-7, 10-13.) Defendants largely do not dispute the fact that the categories of information listed by Defendants were provided to Nolz by Rokt over the course of his employment with Groupon, but argue, inter alia, that much of the information discussed in the first round of supplemental briefing is public, was not misappropriated by Defendants, and concerns information particular to Groupon's business for a limited period of time, which has

little application to other publishers with which AdsPostX may do business.  (See docket entry no. 72 ("Defs. Supp. Opp. Mem.") at 4-13.)

Also produced during discovery and proffered during the first round of supplemental briefing were two videos created by Niyogi.  The first video, which is approximately fourteen minutes in duration, was created by Niyogi around August 2022 and consists of Niyogi recording his computer screen as he downloaded and explored Rokt's Shopify App.  (See docket entry no. 78-6 ("Niyogi Shopify Tr.")[4]; docket entry no. 74 ("Niyogi Supp. Decl.") ¶ 22; docket entry no. 74-4.)  At the start of the video, Niyogi identified the three Shopify stores listed in the Complaint (Compl. ¶ 57) as "development stores" used for app development and testing, meaning that they are not live storefronts.  (Niyogi Shopify Tr. at 2.)  Niyogi also stated that the purpose of the video, which was shared with "a few AdsPostX employees," was to demonstrate "how Rokt works with Shopify so we're aware of what they're doing based on some research."  (Niyogi Supp. Decl. ¶ 22; see also Niyogi Shopify Tr. at 4 ("So this a quick, the overview of this video is to say, here's how Rokt is running their app.").)  After walking through the functions of the Rokt Shopify App, Niyogi identified proposed improvements to building AdsPostX's platform.  (See, e.g., Niyogi Shopify Tr. at 4 ("I will say that I think our system should be even more graceful.  We don't actually need to build an embedded app."); id. at 5 ("So what I imagine is a world where, you know, they click on apps, they see the AdsPostX one, and then they bounce over to the AdsPostX board directly . . . ."); Niyogi Supp. Decl. ¶ 22.)  Niyogi contends that he downloaded the App for "general market research purposes."  (Niyogi Supp. Decl. ¶ 22.)  At the time the video was created, the AdsPostX Shopify app was either not yet in

---

[4]    Defendants provided the referenced video, labeled with Bates number ADSPOSTX_0010335, to the Court and Plaintiffs via USB drive and share link, respectively.  (See docket entry no. 74-4.)

development or in the beginning stages of development.  (Niyogi Decl. ¶¶ 32, 35 (stating that he instructed one of AdsPostX's developers to work on building the AdsPostX Shopify app on September 8, 2022, and that the minimum viable product for the app was completed on October 14, 2022).)

Niyogi created the second video in January 2023, prior to the onset of the instant litigation.  (Niyogi Supp. Decl. ¶ 5; docket entry no. 74-3.[5])  This video is approximately twenty-five minutes in duration and is again a screen-recorded video narrated by Niyogi, which consists of Niyogi cycling through advertisement offers served by Rokt on a public Groupon webpage, and occasionally refreshing the webpage so that a new slate of offers would be served.  (Niyogi Supp. Decl. ¶¶ 5-6.)  The purpose of the video, according to Niyogi, was to "demonstrate to others at AdsPostX how Rokt delivers its ads and what advertisers use Rokt."  (Id. ¶ 5.)

Transfer and Status

On April 28, 2025, this case was transferred to the undersigned.  In response to the Court's order (docket entry no. 126), the parties thereafter filed a joint status report, indicating that the instant motion for a preliminary injunction remained pending.  (See Jt. Stat. Rpt.)  The parties did not request leave for further supplemental briefing (see id. at 4-7), and have not requested an evidentiary hearing in connection with the motion, instead requesting that the Court resolve the motion based on the parties' submissions.  (Docket entry no. 124 at 8-9; see also generally Jt. Stat. Rpt); see also, e.g., Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) (explaining the circumstances under which an evidentiary hearing is not required, and noting that a party "may, of course, waive its right to an evidentiary hearing" (citations

---

[5]    Defendants provided the referenced video, labeled with Bates number ADSPOSTX_0000952, to the Court and Plaintiffs via USB drive and share link, respectively.  (See docket entry no. 74-3.)

omitted)); <u>Atari Games Corp. v. Nintendo of Am., Inc.</u>, 897 F.2d 1572, 1575-76 (Fed. Cir. 1990)

("The district court need not make binding findings of fact [in resolving a motion for preliminary

injunction], but at the very least, must find probabilities that the necessary facts can be proved."

(citation omitted)).

<u>D</u><small>ISCUSSION</small>

A party seeking a preliminary injunction must establish: "(1) 'irreparable harm';

(2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to

the merits of its claims to make them fair ground for litigation, plus a balance of the hardships

tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the

public interest.'" <u>New York v. Actavis PLC</u>, 787 F.3d 638, 650 (2d Cir. 2015) (citation

omitted). The purpose of a preliminary injunction "is to give temporary relief based on a

preliminary estimate of the strength of plaintiff's suit, prior to the resolution at trial of the factual

disputes and difficulties presented by the case." <u>Citigroup Global Mkts., Inc. v. VCG Special</u>

<u>Opportunities Master Fund, Ltd.</u>, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks and

citation omitted). The "serious questions" standard "permits a district court to grant a

preliminary injunction in situations where it cannot determine with certainty that the moving

party is more likely than not to prevail on the merits of the underlying claims, but where the

costs outweigh the benefits of not granting the injunction." <u>Id.</u> (citation omitted). The value of

this approach "lies in its flexibility in the face of varying factual scenarios and the greater

uncertainties inherent at the outset of particularly complex litigation." <u>Id.</u>

Rokt premises its motion for preliminary injunction on four of its five claims

asserted in the Complaint: misappropriation of trade secrets under the DTSA (Count I) and under

New York common law (Count II), unfair competition (Count III), and breach of contract (Count

IV).  (Docket entry no. 8 ("Pls. Mem.") at 11 n.4.)  The Court addresses the apparent merits of these claims in turn, before addressing the remaining prongs of the standard for a preliminary injunction.

<u>Likelihood of Success on the Merits/Sufficiently Serious Questions Going to the Merits</u>

<u>Misappropriation of Trade Secrets (Counts I & II)</u>

To state a claim under the DTSA, a plaintiff must allege "(1) the existence of a trade secret . . . and (2) misappropriation of that secret[.]"  <u>Ahmad v. Day</u>, No. 20-CV-4507-JMF, 2023 WL 3847144, at *6 (S.D.N.Y. June 6, 2023) (citation and internal quotation marks omitted); 18 U.S.C. § 1836(b)(1) (Westlaw through P.L. 119-34).  "Trade secret" is broadly defined to include "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized" so long as (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3) (Westlaw through P.L. 119-34).

"Misappropriation" for purposes of the DTSA is similarly broad, defined to include, in relevant part:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>>
>>> (I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

18 U.S.C. § 1839(5) (Westlaw through P.L. 119-34).  "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Id. § 1839(6)(A).

Similarly, under New York law, "a plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  Intertek Testing Servs., N.A., Inc. v. Pennisi, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020) (internal quotation marks and citation omitted); see also Free Country Ltd. v. Drennen, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) ("The requirements for showing a misappropriation of a trade secret are similar under state and federal law.").  Precisely because "the requirements are similar, courts have found that a complaint sufficiently pleading a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law."  Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P., No. 21-CV-00038-MKV, 2022 WL 4072935, at *13 (S.D.N.Y. Sept. 2, 2022) (internal quotation marks and citation omitted).

"Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity."  Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., 68 F.4th 792, 800-801 (2d Cir. 2023) (citations omitted). "The question of whether or not [information] is a trade secret is generally a question of fact."  A.F.A Tours, Inc. v. Whitchurch, 937 F.2d 82, 89 (2d Cir. 1991) (citations omitted); Syntel, 68 F.4th at 801.

Alleged Trade Secret Material

As discussed, following expedited discovery, Rokt focused its supplemental briefing on six categories of trade secrets that it asserts were demonstrably misappropriated:

> (1) the relative value driven by specific advertisers, verticals, and sub-verticals; (2) the relative performance of different user experiences ("UXs"), e.g., based on different designs, locations of logos, and display and content of "call-to-action" buttons; (3) Rokt's pricing strategy; (4) Rokt's rationale for its revenue share model, including Rokt's cost of goods sold and the relative percentage of profits distributed between Rokt and an e-commerce partner; (5) Rokt's non-public clients; and (6) Rokt's engagement rates with clients' end customers by category of e-commerce partner.

(Pls. Supp. Mem. at 6 (citing various portions of proffered record).)  The Court tailors its analysis to these categories, as Rokt does,[6] and finds that Rokt has raised sufficiently serious questions as to the merits of the claims for misappropriation of trade secret under the DTSA and New York law as against Nolz and AdsPostX and to the extent the claims are premised on the first, second, third, and fifth categories, so as to make them a fair ground for litigation.  Examples of allegedly misappropriated information falling into these four categories proffered by Rokt in connection with its briefing respectively include:

> (1) Rokt's Quarterly Business Reviews ("QBRs"), 
>
> (see, e.g., docket entry no. 66-1 at 22-54, 66-85, 87-115; docket entry no. 64 ("Firmstone First Supp. Decl.")

---

[6]    Rokt argues that, although it "chose to emphasize the most important trade secrets in its briefing . . . expedited discovery demonstrated that Defendants misappropriated" all twenty-four types of trade secrets listed in paragraph 53 of the Complaint.  (Docket entry no. 82 ("Pls. Supp. Reply Mem.") at 2.)  The purported trade secrets listed in the Complaint, however, include largely technical and industry-specific terms, and Rokt alone proffered more than 500 pages of discovery materials (see Sherer Decl.).  The Court is not in a position to identify materials in the discovery proffer sua sponte as items falling into the remaining eighteen categories of alleged trade secret information listed in the Complaint, nor, without further specificity from Plaintiffs, trace those materials to instances of Defendants' purported misappropriation.

¶ 4); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ (see Nolz Business Plan; docket entry no. 76 ("Nolz Supp. Decl.") ¶ 18);

(2) Email communications and other Rokt documents regarding ▮▮▮▮ ▮▮▮ (see, e.g., docket entry no. 66-1 at 4-9, 17-18 (email communications); docket entry no. 66-3 at 5 (access request for ▮▮▮▮ document); docket entry no. 66-4 at 2-8 (▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), and Rokt's QBRs, which included ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (see, e.g., docket entry no. 66-1 at 22-54, 66-85, 87-115);

(3) Rokt's pricing model for advertisers, disclosed in Rokt's QBRs (see, e.g., docket entry no. 66-1 at 22-54, 66-85, 87-115), and email communications (see, e.g., docket entry no. 66-1 at 4 (discussing advertising pricing strategy)); and

(5) Lists of Rokt's top-performing advertisers ▮▮▮▮▮▮▮ (see, e.g., Nolz Business Plan (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Firmstone First Supp. Decl. ¶ 4), and writ large (see docket entry no. 66-6 at 32-36 (noting that AdsPostX has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)), as well its ▮▮▮▮▮▮▮▮▮▮▮ (see Nolz Business Plan (including ▮▮▮▮▮▮▮▮▮▮▮▮); docket entry no. 66-4 at 12 (apparently sending over names of Rokt's top ten publishers)).

First, for purposes of the instant motion, Rokt has sufficiently demonstrated that these four categories of information—the first, second, third, and fifth listed categories—"derive independent economic value" from being kept secret and not readily ascertainable through proper means.  Specifically, Rokt proffers that it has spent over a decade investing in research and development, as well as building client relationships, in order to make its technology desirable and profitable, and that its proprietary information could not be easily garnered or duplicated by others in the industry.  (Firmstone Decl. ¶¶ 12-14, 19, 42; Firmstone First Supp. Decl. ¶¶ 7, 10; Firmstone Second Supp. Decl. ¶¶ 7(f)-(g), 9-12.)  Rokt argues persuasively that the listed categories of information would essentially give a competitor an unfair leg up in

offering similar services, because a competitor would be able to, e.g., quickly develop similarly effective technologies like UXs, target Rokt's highest profit-generating advertisers and publishers, and underprice Rokt.  (See, e.g., Compl. ¶¶ 100-101; Pls. Supp. Mem. at 7; Firmstone Decl. ¶¶ 19-20; docket entry no. 37 ("Firmstone Second Decl.") ¶¶ 6-7; Firmstone First Supp. Decl. ¶¶ 7, 10; Firmstone Second Supp. Decl. ¶¶ 15-18.)  As Rokt notes, these kinds of information have routinely been found to constitute trade secret information.  See, e.g., Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.), 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." (citation omitted)); N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999) ("A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." (internal quotation marks and citations omitted)); ExpertConnect, L.L.C. v. Fowler, No. 18-CV-4828-LGS, 2019 WL 3004161, at *1, 4-5 (S.D.N.Y. July 10, 2019) (finding trade secret element sufficiently alleged as to material including " . . .'pricing and pricing methodologies, sales data, expert quantifiers and preferences, [and] marketing materials,'" because such material would afford competitor unfair advantage to, e.g., "underprice . . . and divert customers").

Second, Rokt has sufficiently demonstrated that it took reasonable measures to maintain the secrecy of this information within the meaning of the DTSA and under New York law.  Specifically, Rokt asserts that it requires third parties to enter into confidentiality agreements—in this case the Rokt/Groupon Agreement—to prevent the disclosure of information deemed confidential or proprietary under the governing agreement, and, as to certain kinds of information, Rokt additionally prevents general or inadvertent access to shared

information by making documents accessible only through certain approved emailed addresses. (Firmstone Decl. ¶¶ 17, 24; Firmstone First Supp. Decl. ¶¶ 12-15); see, e.g., ExpertConnect, 2019 WL 3004161, at *1 (finding sufficiently alleged efforts to protect trade secret information where, inter alia, plaintiff required confidentiality and non-disclosure agreements and made trade secret accessible only through "password protected entry points").  An example of the latter category provided by Rokt is its Quarterly Business Reviews, which contained ███████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████ (Pls. Supp. Mem. at 6-7.)  When Rokt shared its QBRs with Groupon, its practice was to do so through restricted access-links to a secure website. (Firmstone First Supp. Decl. ¶ 13.)  Access to QBR documents was provided to only a limited number of email addresses at both Rokt and Groupon through the secure link, and these specifically authorized user accounts would be required to input their email address to obtain access to and download the QBR.  (Id. ¶¶ 13-14.)

Defendants contend that Rokt has not met its burden on the merits to establish a trade secret as to each of the six categories highlighted in Rokt's supplemental briefing.[7]  (Defs. Supp. Opp. Mem. at 4-13.)  As to Rokt's first category of alleged trade secret information, the "relative value driven by specific advertisers, verticals, and sub-verticals," Defendants argue that the "alleged value and importance of Rokt's advertisers is observable on the face of Rokt's product" because consumers can toggle through advertisers' offers and determine which

---

[7]    The Court has considered all of Defendants' arguments and, save for the arguments concerning the fourth and fifth categories of alleged trade secret, as discussed below, finds them to be unavailing.  The remainder of this subsection reviews the primary contested arguments.

advertisers are paying for premium placements based on their position in the queue of served

offers, which Defendants assert is the method they employed to determine Rokt's top advertisers.

(Defs. Supp. Opp. Mem. at 4-5 (citing, inter alia, Niyogi Supp. Decl. ¶¶ 5, 8).)  In any case,

Defendants argue that any information that they would have received in this category of alleged

trade secret was particularized to Groupon for limited periods of time in the past and premised on

a revenue model different than AdsPostX's, and thus is of little value to Defendants.  (Defs.

Supp. Opp. Mem. at 5-6; Nolz Supp. Decl. ¶¶ 14-16.)  Rokt, however, asserts that its most

valuable advertisers cannot be determined in the manner purportedly relied upon by Defendants,

because ██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████.  (Docket entry no. 82 ("Pls. Supp.

Reply Mem.") at 3-4 (citing various portions of Firmstone Second Supp. Decl.).)  In a

declaration proffered by the Senior Vice President of Rokt Corp.,[8] Ashley Firmstone

("Firmstone"), Firmstone also explains that ████████████████████████

██████████████████████████████████████████

████████.  (Firmstone Second Supp. Decl. ¶ 18.)  Firmstone further explains that ███████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████.  (Id. ¶¶ 15-17.)  Defendants' assertion that the information particular

---

[8]     Rokt Corp. is an indirect wholly owned subsidiary of Rokt Pte Ltd.  (Firmstone Decl. ¶ 1.)

to Groupon bears no relevance to AdsPostX is also belied by ████████████████

████████████████, as explored further below.  (See Nolz Business Plan.)

   Turning to the next contested category of alleged trade secret, the relative

performance of different UXs, Defendants again argue that "the 'relative value' of user

experience alternatives on Rokt's mobile or desktop advertisements are apparent on the face of

its public advertisements[,]" and that, in any case, AdsPostX's publishers can personalize their

UX.  (Defs. Supp. Opp. Mem. at 7-8.)  While the features of various Rokt UXs may themselves

be apparent, information regarding the UXs that are the most effective in, e.g., generating

revenue and consumer engagement, is not, and it is this information that Rokt asserts is protected

trade secret.  (See Firmstone Decl. ¶ 11 (identifying as trade secret "the relative performance of

different [UXs] and [UIs] as measured and tested by Rokt for over a decade" and asserting that

such information would allow a competitor to build its own UX in reliance on Rokt's historical

performance data (emphasis added)).)  Moreover, as Rokt notes, AdsPostX must present clients

with UX options in the first instance, and thus cannot disclaim all similarities in AdsPostX's UX

as the result of user preference.  (See Pls. Supp. Reply Mem. at 4-5; Niyogi Supp. Decl. ¶ 17

(stating that AdsPostX "allow[s] the publisher to select the elements that go into post-transaction

ads[,]" including the location of logos and the display of buttons on advertisements served by

AdsPostX); Nolz Supp. Decl. ¶ 11 (same).)  In other words, publishers utilizing AdsPostX's

services can only make their advertisement UXs appear similar to Rokt's if the relevant

AdsPostX platform grants them that capability.

   Defendants' arguments concerning the third and fifth categories, Rokt's pricing

strategy and non-public clients, largely mirror those articulated above and are unavailing for the

same reasons.  (Defs. Supp. Opp. Mem. at 9-10 (arguing that information concerning pricing

strategy would not be relevant to AdsPostX because it uses a different revenue model and the projections included in the discovery proffer are particularized to Groupon); id. at 11-12 (arguing that (1) Rokt's clients are largely public, but failing to account for the value of client lists in the aggregate and the effort that would be required to otherwise identify non-public clients, and (2) the relative value of these advertisers could be ascertained based on which advertisers appear most often).)  Defendants' arguments regarding the purportedly public nature of many of Rokt's clients are particularly unavailing where, as here, discovery suggests that Defendants were relying, at least in part, upon lists of Rokt's most profitable publishers and advertisers obtained by Nolz in the course of his employment with Groupon or compiled with information therefrom. (See, e.g., Nolz Business Plan (█████████████████████████████████ ████████████████████████); docket entry no. 66-4 at 12 (apparently sending names of Rokt's top ten publishers); docket entry no. 66-6 at 32-36 (noting that AdsPostX has ████████████████████████████████████████████); see also, e.g., Integrated Cash Mgmt. Servs. v. Digital Transactions, Inc., 920 F.2d 171, 174 (2d Cir. 1990) ("'[A] trade secret can exist in a combination of characteristics and components, each of which, by itself is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'" (citation omitted)); Cross Media Mktg. Corp. v. Nixon (In re Cross Media Mktg. Corp.), No. 06-CV-4228-MBM, 2006 WL 2337177, at *4 (S.D.N.Y. Aug. 11, 2006) ("A customer list that contains information such as the identities and preferences of client contacts is a protectable trade secret." (citations omitted)); Leo Silfen, Inc. v Cream, 278 N.E.2d 636, 640 (N.Y. 1972) ("[W]here the customers [on a plaintiff's customer list] are not known in the trade or are discoverable only by

extraordinary efforts courts have not hesitated to protect customer lists and files as trade secrets." (citations omitted)).

Finally, Defendants raise a number of arguments regarding the extent to which the Rokt/Groupon Agreement and Platform Services Agreements protected the materials referenced in the foregoing categories of alleged trade secrets, such that Rokt could be found to have taken reasonable measures to maintain its confidentiality.  Each of these arguments is also unavailing. First, Defendants argue that the Rokt Platform, "Rokt Widget," UI/UX, pricing data, and ad-serving technology are not encompassed within the Rokt/Groupon definition of "Confidential Information," because the definition of "Confidential Information" does not expressly reference those materials, some of which are separate, explicitly defined terms (e.g., "Rokt Platform" and "Rokt Widget").  (Docket entry no. 31 ("Defs. Opp. Mem.") at 14-15.)  "Confidential Information" is, however, broadly defined to include "all information about [Rokt's] business, business plans, strategies, customers, suppliers, and strategic business relationships (however recorded or disclosed in writing, orally or in electronic form)" (Rokt/Groupon Agreement at 3), which would render a correspondingly broad interpretation of the term proper, and other provisions in the Rokt/Groupon Agreement suggest that "Confidential Information" was not intended to exclude other defined terms from its ambit.  In particular, amended section 11.4(c) of the Agreement contains a stipulation that "[Groupon] acknowledges that all ROKT Data is Confidential Information of ROKT."  (Id. at 16.)  In other words, the Agreement contemplated that at least one other separately defined term in the Agreement, "ROKT Data," fell within the broad definition of Confidential Information, belying the narrow interpretation of the term advanced by Defendants.

Defendants similarly argue that a number of the categories of alleged trade secret constitute information that would be considered ███████████████████████ as defined in the Rokt/Groupon Agreement, and therefore cannot be considered material owned by Rokt and subject to trade secret protection.  (See Defs. Supp. Opp. Mem. at 8-9 (arguing that the ██████████████████████████████████████████████████████); id. at 9 (arguing that ████████████████████████████████████████ ████████████████████).)  The agreement defines ██████████ as ███████ ████████████████████████████████████████████████ █████████████████████████████████ (Rokt/Groupon Agreement at 14.) ██████████████ is defined as █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████ (Id.)

As noted by Rokt, ██████████████████████████████████████ ████████████████████████████████████ (Pls. Supp. Mem. at 4.) Moreover, ██████████████████████████████████████████ ████████████████████████ there is nothing in the Agreement's language to suggest that Rokt lacks ownership rights in such information.  While the Agreement limits the purposes for which Rokt can use ██████████████ stemming from the Rokt/Groupon Agreement (see Rokt/Groupon Agreement at 16 (restricting use of █████████████████████████████ ████████████████████████████████)), the Agreement nevertheless

stipulates that ROKT ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████    (Id. at 16 (emphasis added).)

However, as to the fourth and sixth categories of alleged trade secret—Rokt's rationale for its revenue share model, and its engagement rates with clients' end customers by category of e-commerce partner—it is not clear to the Court at this time what non-public information Rokt is seeking to protect as trade secret, and the Court cannot evaluate the merits of claims premised on the alleged misappropriation of any such information on the current record. Rokt does not dispute that its 50/50 revenue share model for agreements between Rokt and client publishers is available on Rokt's website in its Platform Services Agreement.  (See Defs. Supp. Opp. Mem. at 10 (citing docket entry no. 31-10); Defs. Opp. Mem. at 13 (same); Nolz Decl. ¶ 66).  Rokt also does not rebut Defendants' argument that Defendants never had access to the rationale behind Rokt's 50/50 revenue share arrangement, and, from the discovery materials proffered, it is not clear that Rokt shared any such information with Defendants.  (See Defs. Opp. Mem. at 13-14; Defs. Supp. Opp. Mem. at 10; Nolz Decl. ¶ 67.)  Finally, there are no specific arguments in Rokt's briefing as to engagement rate data it purportedly shared, Rokt does not rebut Defendants' argument that Rokt has failed "to present any evidence that any such information was received . . . by Defendants" (Defs. Supp. Opp. Mem. at 13), and it is not clear from the discovery materials proffered that any such information was indeed shared.[9]

---

[9]    While there are slides in Rokt's QBRs that detail ████████████████
████████████████████ (see, e.g., docket entry no. 66-1 at 33), this information is identified as ████████████████████████ and would therefore seemingly be encompassed within the first category of trade secret information identified by Rokt, "the relative value driven by specific . . . verticals, and sub-verticals" (Compl. ¶¶ 31, 53(a); Firmstone First Supp. Decl. ¶ 3).

Accordingly, the Court finds that Rokt has not established sufficiently serious questions as to the viability of its trade secret misappropriation claims premised on the fourth and sixth categories of purported trade secret information.

Misappropriation

Nolz and AdsPostX

Rokt has also raised sufficiently serious questions regarding Nolz's, and by virtue of Nolz, AdsPostX's, misappropriation of the four categories of alleged trade secret reviewed by the Court in the foregoing subsection. A number of the most straightforward examples of such alleged misappropriation were highlighted by Plaintiffs in their supplemental briefing, and enumerated by the Court in the above Facts section, see supra pp. 9-10. (See also Pls. Supp. Mem. at 11-12.) Of particular note is the business plan for AdsPostX created by Nolz on or about April 24, 2022 (Pls. Supp. Mem. at 15; Firmstone Second Supp. Decl. ¶ 4; Nolz Supp. Decl. ¶ 18), which directly incorporated ███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████ (See Nolz Business Plan.) Rokt has also proffered communications between Nolz and others at AdsPostX in which Defendants shared information concerning the relative performance of Rokt's publishers and advertisers with others at AdsPostX and third parties, e.g., Rokt's top ten publishers (see docket entry no. 66-4 at 12), the assertion that Rokt's ████████████████████████████████████ (see, e.g., docket entry no. 66-6 at 43), and the assertion that ████████████████████ ██████████████████████████████ (docket entry no. 66-7 at 23). (See also, e.g., docket entry no. 66-6 at 32-36 (asserting in update to partner advertising firm that

Defendants ███████████████████████████████████████████)  As

discussed in the preceding section, Rokt argues persuasively that none of the foregoing

information could have been derived from publicly available materials, and that such information

constitutes trade secrets.

Rokt also points to at least two instances in which Nolz used his AdsPostX email

address to access or receive Rokt's confidential documents containing trade secret information

during the period in which Nolz concedes he was developing AdsPostX.  (See docket entry no.

66-3 at 5 (requesting access to █████████████ document); docket entry no 66-5 at 16

(sending Rokt's May 2022 QBR from personal Yahoo email address to AdsPostX email

address).)  While Nolz argues that he does not remember taking such actions, and that any such

access was the accidental result of Nolz sharing documents with himself while working

remotely, the facts that Nolz (1) sent a copy of the May 2022 QBR—a document containing a

host of alleged trade secret information that could only be accessed from Nolz's Groupon email

account—from his personal Yahoo email account to his AdsPostX email account nearly two

months after the presentation was sent to Groupon (Pls. Supp. Mem. at 10-11; docket entry no.

66-5 at 16), and (2) attempted to access a document concerning Rokt's widget design on the day

he created his AdsPostX email (see Nolz Supp. Decl. ¶ 7) and only a few days after he created

the AdsPostX business plan that discussed, in part, Rokt's widget (Nolz Business Plan; docket

entry no. 66-3 at 5), nevertheless raise sufficiently serious questions as to whether any of the

purported trade secret information contained in these documents was improperly used or

disclosed, i.e., "misappropriated," by Nolz.

Finally, Rokt identifies one instance in which Nolz shared with other AdsPostX

employees a spreadsheet containing certain Rokt advertising performance data that Nolz had

apparently created during his time at Groupon.  (See docket entry no. 66-4 at 14; Nolz Supp. Decl. ¶¶ 29-30.)  Nolz concedes that he shared this spreadsheet with AdsPostX employees, but asserts that he only did so for "aspirational" purposes to encourage similarly successful performance by AdsPostX, and that AdsPostX did not otherwise "use" the information.  (Nolz Supp. Decl. ¶ 30; Defs. Supp. Opp. Mem. at 21-22.)  However, even assuming that Nolz's assertions are accurate, "misappropriation" for purposes of the DTSA or under New York law includes the improper disclosure of trade secret information, such as disclosure in breach of a confidentiality agreement, without regard to the motivation for such disclosure.  See 18 U.S.C. § 1839(5)(B), (6) (listing circumstances under which "disclosure" of trade secret information is actionable, and defining "improper" to include "breach of a duty to maintain secrecy"); Integrated Cash Mgmt. Servs., 920 F.2d at 173 ("A plaintiff claiming misappropriation of a trade secret must prove . . . defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." (internal quotation marks and citations omitted)).

Much of Nolz's foregoing conduct also raises sufficiently serious questions as to AdsPostX's liability.  As corporations can act only through their agents, "[a]cts performed and knowledge acquired by a corporate agent within the scope of his or her employment are imputed to the corporation[,]" therefore "misconduct of an agent . . . is imputed to the corporation if committed within the scope of the agent's employment."  In re Parmalat Sec. Litig., 684 F. Supp. 2d 453, 471-72 (S.D.N.Y. 2010) (citations omitted).  Nolz's alleged misappropriation of trade secrets, to the extent undertaken on behalf of AdsPostX and in Nolz's capacity as co-founder and Chief Executive Officer of AdsPostX, is thus imputable to AdsPostX.

In sum, through its briefing and evidentiary proffers, Rokt has, at the very least, raised sufficiently serious questions going to the merits of its trade secret misappropriation claims asserted under the DTSA and New York common law as against Nolz and AdsPostX, to the extent premised on the four above-listed categories of alleged trade secret, so as to make such claims fair grounds for litigation.

<u>Niyogi</u>

Rokt has not, however, raised sufficiently serious questions as to Niyogi's misappropriation of Rokt's trade secrets to warrant preliminary injunctive relief. Although Rokt asserts trade secret misappropriation claims against all Defendants, including both Nolz and Niyogi, Rokt alleges that Nolz received twenty-four categories of information, whereas Niyogi allegedly received only three. (<u>Compare</u> Compl. ¶ 53 (listing categories allegedly misappropriated by Nolz), <u>with</u> id. ¶ 59 (same as to Niyogi); <u>see also</u> Firmstone Decl. ¶¶ 30, 35.) Because each of the six categories of information that are the subject of Rokt's supplemental briefing—and, as a result, the foregoing analysis by the Court—were only alleged to have been received by Nolz (<u>see</u> Pls. Supp. Mem. at 6; Compl. ¶ 59(a), (b), (c), (d), (e), (g); Firmstone Decl. ¶¶ 30, 35), the Court is not able to adequately evaluate the merits of Rokt's claims to the extent premised on the information received by Niyogi. <u>See</u> discussion <u>supra</u> pp. 17-18 and n.6.

Rokt asserts that it can also establish its misappropriation claim as to Niyogi via Niyogi's "accessing, using, and disclosing [the above-discussed] trade secret information derived from Nolz" (Pls. Supp. Mem. at 13 (citing <u>Fabkom, Inc. v. R.W. Smith & Assocs., Inc.</u>, No. 95-CV-4552-MBM, 1996 WL 531873, at *12 (S.D.N.Y. Sept. 19, 1996)), but Rokt appears to proffer only one example from the record in support of this assertion, which is not persuasive. Rokt specifically identifies an email communication between Niyogi and Groupon, in which

Niyogi pitched AdsPostX's services to Groupon and stated "we have the same advertisers that Rokt does (we've seen this time and time again as we test across sites we know run Rokt)[.]" (Id. at 13 (citing docket entry no. 66-4 at 22-23).)  This communication, however, does not reveal any non-public clients of Rokt's, and it is not clear from the content of the communication, Rokt's briefing, or the record that Niyogi knew or had reason to know that he was relying on improperly-acquired information regarding Rokt clientele to compare AdsPostX's services to Rokt's, if in fact he was.  See 18 U.S.C. § 1839(5)(B)(ii) (defining "misappropriation" via improper disclosure under DTSA).  Niyogi's email instead references testing across publicly-accessible websites, and Niyogi has proffered examples of such testing that he personally conducted.  (See Niyogi Supp. Decl. ¶ 5; docket entry nos. 74-1, 74-2, 74-3.)

In sum, Rokt has not raised sufficiently serious questions regarding Niyogi's misappropriation of Rokt's trade secret information, whether allegedly acquired directly by Niyogi or shared with Niyogi by Nolz and subsequently disclosed further, to make the trade secret misappropriation claims as against Niyogi fair grounds for litigation.

Count III: Unfair Competition

Generally, "New York common law recognizes two theories of common-law unfair competition: palming off and misappropriation."  Kid Car NY, LLC v. Kidmoto Techs. LLC, 518 F. Supp. 3d 740, 760 (S.D.N.Y. 2021) (internal quotation marks and citations omitted).  As relevant to the instant dispute, a plaintiff proceeding on a misappropriation theory must plead "facts giving rise to a plausible inference that the defendant, acting in bad faith, misappropriated the plaintiff's labor and expenditures to gain a commercial advantage or maliciously interfered with the plaintiff's good will."  LivePerson, Inc. v. 24/7 Customer, Inc., 83 F. Supp. 3d 501, 519 (S.D.N.Y. 2015) (citation omitted).  "In this context, bad faith can be

established by a showing of fraud, deception, or an abuse of a fiduciary or confidential

relationship." Schroeder v. Pinterest Inc., 17 N.Y.S.3d 678, 693 (N.Y. App. Div., 1st Dep't

2015) (citation omitted).  "The essence of the misappropriation theory is not just that the

defendant has reaped where it has not sown, but that it has done so in an unethical way and

thereby unfairly neutralized a commercial advantage that the plaintiff achieved through "honest

labor[.]'" E.J. Brooks Co. v Cambridge Sec. Seals, 31 N.Y.3d 441, 449 (2018) (internal

quotation marks and citation omitted).  "New York's law of unfair competition is a 'broad and

flexible doctrine that depends more upon the facts set forth . . . than in most causes of

action.'" Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001) (citation

omitted); see also Linkco, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 500 (2002) ("[T]he Second

Circuit has made clear that unfair competition is not limited to the categories of infringement that

have been described in New York's pattern jury instructions or recognized by courts, but instead

encompasses a broad range of conduct." (citations omitted)).

    A claim for unfair competition under New York law therefore differs from

misappropriation of trade secret under the DTSA and New York common law in at least two

material respects: (1) the information misappropriated under a claim for unfair competition need

not rise to the level of trade secret, Berman v. Sugo LLC, 580 F. Supp. 2d 191, 209 (S.D.N.Y.

2008), and (2) a claim for unfair competition requires the defendant to have acted in bad faith,

whereas DTSA and New York trade secret misappropriation claims do not—although the latter

claims do allow for punitive damages in such circumstances, 18 U.S.C. § 1836(b)(3)(C)

(Westlaw through P.L. 119-34) (providing for award of "exemplary damages" under DTSA

where the misappropriation was willful and malicious); Wrap-N-Pack, Inc. v. Kaye, 528 F. Supp.

2d 119, 126-27 (E.D.N.Y. 2007) (providing for punitive damages under New York common law

where defendant's conduct is "aggravated by recklessness or willfulness" (citations omitted)). See, e.g., Kraus USA, Inc. v. Magarik, No. 17-CV-6541-ER, 2020 WL 2415670, at *15 (S.D.N.Y. May 12, 2020).

   The Court finds that the record includes facts sufficient to frame sufficiently serious questions as to Defendants' unfair utilization of Rokt's confidential and trade secret information to make them a fair ground for litigation of Rokt's unfair competition claim.  Rokt's briefing and the evidentiary proffers suggest that Defendants worked to build AdsPostX based on the publicly available information regarding Rokt that it could obtain, as well as information that was, at the very least, confidential under the Rokt/Groupon Agreement and, as to Niyogi, the Platform Services Agreement, see discussion infra pp. 36-38, if not trade secret.  See discussion supra pp. 17-30; (see also, e.g., Pls. Supp. Mem. at 16; docket entry no. 66-10 at 2 (sending screenshot of Rokt widget design from Groupon email address to personal address); Nolz Business Plan (looking to ███████████████████████████████████); docket entry no. 66-10 at 3-161 (comparing Rokt source code to AdsPostX source code); docket entry no. 66-6 at 41-42 (inquiring as to whether AdsPostX had access to Rokt's Software Development Kit for its mobile application to try to "download [it] and review it practically" to identify areas of potential improvement); docket entry no. 66-4 at 13 (sending over language from one of Rokt's legal documents); docket entry no. 66-4 at 10 (sharing Rokt contracts with others at AdsPostX)).  Rokt has also proffered evidence suggesting that Defendants thereafter attempted to systematically target Rokt's clientele, particularly its high-value clientele, highlighting the similarities between Defendants' services and Rokt's.  (See, e.g., docket entry no. 66-6 at 32-36 (noting that AdsPostX has ████████████████████████████ ██████████████████████); docket entry no. 66-4 at 12 (apparently sending over names of

Rokt's top ten publishers); Pls. Supp. Mem. at 16-17 (identifying documents showing that Defendants advertised AdsPostX's services as the same, "exact," or similar to Rokt)); see also Paz Sys. v. Dakota Group Corp., 514 F. Supp. 2d 402, 409-10 (E.D.N.Y. 2007) (finding that the same alleged acts that supported a claim for misappropriation of trade secrets also supported a claim for unfair competition where plaintiff's customers were solicited by certain defendants using plaintiff's confidential and improperly accessed files).

Rokt's proffers of evidence obtained through the expedited discovery also demonstrate that Nolz reached out to third parties, including those he knew to be either Rokt's clients or prospective clients, from his Groupon email address and purporting to act as a peer-publisher, often without disclosing his connection to AdsPostX, to undermine Rokt and obtain the parties' business. (See, e.g., Pls. Supp. Mem. at 15; docket entry no. 66-3 at 2, 17 (reaching out █████████████████████████████████████████████████████████████ █████████████████████████████████████████████); id. at 3-4 (inquiring ████████████████████████████████████████████████████████████████ ████████████████████████████████████████) In one particularly egregious example, Nolz connected a representative from his then-employer, Groupon, to AdsPostX via Niyogi, in an attempt to move Groupon's business to AdsPostX without disclosing his interest in AdsPostX and while disparaging Rokt's services. (Pls. Supp Mem. at 15-16; docket entry no. 66-2 at 11-15; docket entry no. 66-3 at 16; docket entry no. 66-4 at 22-23).) In email communications with ████████, an advertising partner of AdsPostX, Nolz discussed how Defendants could "steal a big one from Rokt" with this effort, and represented that he would "help drive from the inside." (Docket entry no. 66-7 at 25-26.)

There are also sufficiently serious merits questions concerning Defendants' bad faith, given the numerous examples proffered from the discovery materials in which Nolz sought to expedite the completion of AdsPostX before Rokt became aware of AdsPostX's efforts, the multiple instances in which Defendants described their services as similar or the same as Rokt's, and Defendants' repeated discussions of "stealing" or targeting Rokt clientele. (See, e.g., Pls. Supp. Mem. at 16-17 (gathering instances in discovery where Defendants described AdsPostX's services as the same, "exact," or similar to Rokt); Nolz Business Plan (asserting that ████

████████████████████████████████████████████████████████████████████

████████████████████); docket entry no. 66-6 at 43 (asserting "need to be careful or not about letting the stealth nature of our operation out of the bag too early. It is bound to happen but would like to stoke the fire a little more before Rokt gets wind of our operation"); docket entry no. 66-7 at 3 ("Executive Summary" slide deck for AdsPostX listing a number of new clients, including one identified as "our first steal from Rokt")).

Finally, despite Defendants' arguments, the Court is not persuaded at this time that Rokt's claim for unfair competition is duplicative of its claims for misappropriation of trade secrets. While Courts have found the two types of claims to be duplicative where premised on the exact same factual predicate, see, e.g., Uni-Systems, LLC v. U.S. Tennis Ass'n, 350 F. Supp. 3d 143, 179 (E.D.N.Y. 2018) ("A claim for unfair competition based on the same allegations as a claim for misappropriation of trade secrets is treated as a single cause of action."), the conduct underlying Rokt's unfair competition claim in the instant action is premised not only on information that Rokt alleges comprises trade secret information, but also on information that Rokt alleges was confidential and proprietary under the terms of the relevant agreements that may not rise to the level of trade secret (compare Compl. ¶¶ 82-106, with id. ¶¶ 109, 112).

Moreover, Rokt is entitled to plead the unfair competition claim in the alternative to its trade secrets claims, in the event that any of the information underlying its trade secret claims is ultimately found to constitute confidential information, but not actionable trade secret information.  See FED. R. CIV. P. 8(d)(2); Linkco, 230 F. Supp. at 501-502 (gathering cases in which doctrine of unfair competition applied where plaintiff had alleged misappropriation of information that did not rise to the level of misappropriation of trade secrets).

For these reasons and for substantially the reasons discussed in connection with the trade secret misappropriation claims under the DTSA and New York common law, Rokt has raised sufficiently serious questions concerning the merits of its unfair competition claim as to make the claim fair ground for litigation.

Count IV: Breach of Contract

To state a claim for breach of contract under New York law, a plaintiff must establish: "'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  Ellington Credit Fund Ltd. v. Select Portfolio Servicing Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).  Here, the parties dispute only whether the third element of Rokt's claim—breach of the Rokt Platform Services Agreement by Niyogi—has been met.

The Court finds that Rokt has adequately established its likelihood of success on the merits at least as to the provision of the Platform Services Agreement that prohibited Niyogi from "access[ing] the Rokt Platform in order to build a competitive product or service, to build a product using similar ideas, features, functions or graphics of the Rokt Platform, or to copy any

ideas, features, functions or graphics of the Rokt Platform."[10]  (PSA Agreements at 6 §

8.8(i)(vii), 18 § 8.8(i)(vii), 30 § 8.8(i)(vii).)  Niyogi himself has conceded that he downloaded

Rokt's Shopify App "for general market research purposes," and Defendants produced a video in

which Niyogi recorded himself exploring the Shopify App in order to understand the

application's functionalities as part of his efforts to build a competitor platform for AdsPostX.

(Niyogi Decl. ¶ 28 ("As part of my normal market due diligence, I installed Rokt's Shopify App

to the Shopify development stores that I had created previously in connection with a different

business venture to see what kind of information Rokt was providing publicly."); Niyogi Supp.

Decl. ¶ 22; Niyogi Shopify Tr. at 4 ("Here's what the user experience looks like when you

purchase with the Rokt extension enabled on a store . . . I will say that I think our system should

be even more graceful. We don't actually need to build an embedded app.").)  Notably, at the

time Niyogi created the video, the AdsPostX Shopify app was either not yet in development or

was in the beginning stages of development.  (Niyogi Decl. ¶¶ 32, 35 (stating that he instructed

one of AdsPostX's developers to work on building the AdsPostX Shopify app on September 8,

2022, and that the minimum viable product for the app was completed on October 14, 2022).)

While Defendants contend that Niyogi's conduct amounted to no more than standard "market

research" (Niyogi Supp. Decl. ¶ 22), that conduct is exactly what the Platform Services

Agreement expressly prohibited—"access[ing] the Rokt Platform in order to build a competitive

---

[10]     In its first round of supplemental briefing, Rokt argues that Niyogi's concession that he
shared the video with other AdsPostX employees also establishes breach of the Platform
Services Agreement provision that prohibits "shar[ing] non-public Rokt Platform features
or content with any third party." (Pls. Supp. Reply Mem. at 9.)  It is not clear to the
Court, however, which features or content reviewed in the video are purportedly non-
public in light of Defendants' contention that Niyogi's "installation of the Rokt [Shopify]
App did not give him access to any information that is not already available on Rokt's
website or in the market" (Defs. Opp. Mem. at 20; see also id. at 13); this contention is
not specifically rebutted by Rokt in its initial or supplemental briefing.

product or service" or to "build a product using similar ideas, features, functions or graphics of the Rokt Platform."  (PSA Agreements at 6 § 8.8(i)(vii), 18 § 8.8(i)(vii), 30 § 8.8(i)(vii).)

<u>Irreparable Harm</u>

The Court finds that Rokt has also demonstrated that it will suffer irreparable harm absent injunctive relief.  "To establish irreparable harm, a party seeking preliminary injunctive relief must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'"  <u>Kamerling v. Massanari</u>, 295 F.3d 206, 214 (2d Cir. 2002) (citation omitted). Such harm must be "actual and imminent, not remote or speculative."  <u>Id.</u> (citations omitted).

As discussed, Rokt's expedited discovery proffers indicate that Defendants have been using, at the very least, confidential information obtained by Defendants to target Rokt clientele, establish their own credibility, and distinguish their services.  The injuries associated with this misuse—loss of good will, harm to reputation, and diversion of clients—all constitute injuries that are difficult to quantify and adequately compensate, <u>i.e.</u>, irreparable harm.  <u>Coastal Distrib., LLC v. Town of Babylon</u>, No. 05-CV-2032-JS-ETB, 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006), <u>aff'd as modified</u>, 216 F. App'x 97 (2d Cir. 2007); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Ime Watchdog, Inc. v. Gelardi</u>, No. 22-CV-1032-PKC-JRC, 2022 WL 1525486, at *7 (E.D.N.Y. May 13, 2022) ("[I]t is clear that, without an injunction, Plaintiff will continue to suffer substantial harm to its goodwill and reputation, and that Defendants will continue to divert clients from Plaintiff."); <u>QBE Americas, Inc. v. Allen</u>, Nos. 22-CV-756-JSR, 22-CV-757-JSR, 2022 WL 889838, at *15 (S.D.N.Y. Mar. 25, 2022) ("Even if [Plaintiff] could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the

harm caused by having its trade secrets misappropriated and used to jump-start a new competitor.").

Balance of the Hardships and Public Interest

The balance of hardships and public interest likewise favor Rokt. Absent injunctive relief, Rokt faces the threat of irreparable harm, as explained above, and it is in the public interest to prevent Defendants from improperly exploiting confidential and trade secret information at Rokt's expense to advance their business. See, e.g., Ime Watchdog, Inc. v. Gelardi, 732 F. Supp. 3d 224, 243 (E.D.N.Y. 2024) ("It goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest." (internal quotation marks and citation omitted)).

Defendants assert that the relief requested by Rokt, if entered by this Court, would essentially force them out of business for the duration of the instant litigation. (Defs. Opp. Mem. at 22-23; Defs. Supp. Opp. Mem. 24-25.) The Court finds that these concerns can be adequately mitigated by tailoring the relief requested by Rokt, in the manner set forth below, and that Defendants' concerns about the feasibility of complying with any injunctive relief granted while remaining operational are further undermined by their assertion that they have successfully "ceased certain practices that Rokt has complained of in this litigation in its discussions with potential customers, such as referencing AdsPostX's estimate based on [allegedly] publicly available information of Rokt's advertisement mix in its client pitch deck." (Nolz Supp. Decl. ¶ 37; Defs. Supp. Opp. Mem. at 24.)

Unclean Hands and Second Round of Supplemental Briefing

Finally, Defendants argue that injunctive relief should be precluded by Rokt's purportedly unclean hands. The doctrine of unclean hands is an equitable defense, "based on the principle that 'since equity tries to enforce good faith in defendants, it no less stringently

demands the same good faith from the plaintiff.'" <u>Dunlop-McCullen v. Local 1-S</u>, 149 F.3d 85, 90 (2d Cir. 1998) (citation omitted).  The doctrine acts as "a limited device, invoked by a court only when a plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent defendant's tortious conduct."  <u>Broad. Music, Inc. v. Hearst/ABC Viacom Entm't Servs.</u>, 746 F. Supp. 320, 329 (S.D.N.Y. 1990) (internal quotation marks and citation omitted).  Moreover, the defense "is not an automatic or absolute bar to relief; it is only one of the factors the court must consider when deciding whether to exercise its discretion and grant an injunction."  <u>Dunlop-McCullen</u>, 149 F.3d at 90 (citation omitted).  Where the defendant "has been guilty of misconduct that is more unconscionable than that committed by plaintiff[,]" the doctrine of unclean hands "may also be relaxed."  <u>Id.</u> (citation omitted).

Defendants point to certain conduct in which Rokt has allegedly engaged during the pendency of this litigation, such as downloading AdsPostX's Shopify App and attempting to hire Nolz for a position at Rokt.  (Defs. Opp. Mem. at 23-24.)  The Court is not persuaded that any such conduct rises to the level of "immoral, unconscionable conduct" that would preclude Rokt's requested injunctive relief, particularly where Defendants do not assert that Rokt has accessed the AdsPostX Shopify App in a way that breaches any kind of contractual duty, or otherwise engaged in any actionable conduct.  <u>See, e.g.</u>, <u>Gustavia Home, LLC v. Hoyer</u>, 362 F. Supp. 3d 71, 89 (E.D.N.Y. 2019); <u>Gidatex, S.r.L. v. Campaniello Imports, Ltd.</u>, 82 F. Supp. 2d 126, 132 (S.D.N.Y. 1999) ("Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior." (citations omitted)); <u>PenneCom B.V. v. Merrill Lynch & Co.</u>, 372 F.3d 488, 493 (2d Cir. 2004)

(gathering examples of cases in which the doctrine has been applied, usually involving fraud or deceit on the court).

Given the foregoing findings premised on the parties' first two rounds of briefing, the Court finds no need to address the second supplemental round of briefing concerning AdsPostX's purported hiring of a former Rokt employee who is not party to this case, which Rokt argued further weighed in favor of its requested injunctive relief.

<u>Requested Relief and Bond</u>

Having found that Rokt is entitled to preliminary injunctive relief premised on the first four claims asserted in its Complaint, as reviewed above, the Court orders that Defendants, and all persons acting in concert with them who receive notice of this preliminary injunction, are hereby preliminarily enjoined, pursuant to Federal Rule of Civil Procedure 65(a), effective immediately and pending the final resolution of this action, from:

(1)  Accessing, copying, communicating, disclosing, sharing, or using any of Rokt's confidential, proprietary, and/or trade secret information in their possession, custody, or control that falls into any one or more of the following four categories:

(a)  the relative value driven by specific advertisers, verticals, and sub-verticals;

(b)  the relative performance of different user experiences ("UXs"), <u>e.g.</u>, based on different designs, locations of logos, and display and content of "call-to-action" buttons;

(c)  Rokt's pricing strategy; and

(d)  Rokt's non-public client list;

(2)  Advertising, marketing, promoting, offering to sell, selling, or distributing AdsPostX advertising or e-commerce platforms, systems, or services that have been developed with the use of Rokt's confidential, proprietary, and/or trade secret information that falls in categories (1)(a) through (1)(d);

(3)  Soliciting, attempting to solicit, or endeavoring to entice away from Rokt, whether directly or indirectly, any Rokt client, whether publicly disclosed or not, using Rokt's confidential, proprietary, and/or trade secret information that falls in categories (1)(a) through (1)(d);

(4)  Further breaching any obligations, or causing another party to breach any obligations, under the Rokt Platform Ad-Serving Agreement, executed by Rokt and Groupon, Inc. on or about August 18, 2015, including the First Amendment to same, executed by Rokt and Groupon, Inc. on or about January 18, 2018;

(5)  Further breaching any obligations, or causing another party to breach any obligations, under Rokt's Platform Services Agreement, executed by Surojit Niyogi on or about August 21, 2022, August 22, 2022, and September 12, 2022, and

(6)  Aiding or abetting any other person or entity engaging in or performing any of the acts referred to in paragraphs 1 through 5 above.

(7)  As security with respect to the foregoing relief, Rokt must post $10,000 cash or insured bond as security with the Clerk of Court by 4:00 p.m. on September 12, 2025.

The Court agrees with Defendants, however, that Rokt's requests that Defendants be enjoined from "[c]riticizing or referring to Rokt's business or services in a negative light in any advertising, marketing, or promotional materials for AdsPostX[,]" "[d]iscouraging, either directly or indirectly, any Rokt client from doing further business with Rokt[,]" and "[b]eing involved with the provision of service to, or otherwise having any business dealings with, any Rokt client in the course of any business concern that is in competition with Rokt's advertising and/or e-commerce services" are overbroad in light of the record before the Court.  (See OSC ¶¶ 3, 5, 6.)  The Motion is therefore denied to the extent it seeks such further relief.

Moreover, Rokt's requests that Defendants be enjoined from engaging in the activities in paragraphs (1) through (3) listed above with respect to any of Rokt's "confidential, proprietary, and/or trade secret information" (see OSC ¶¶ 1-4) lack the specificity mandated by Rule 65(d)(1) of the Federal Rules of Civil Procedure.  See FED. R. CIV. P. 65(d)(1) (providing that every order granting an injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required"); ExpertConnect, LLC v. Parmar, 773 F. App'x 651, 653 (2d Cir. 2019)

(explaining that "an injunction that prohibits the use or disclosure of trade secrets or confidential information must also specifically describe the nature of the secrets or confidential information to be protected[,]" and finding general injunction against defendants using or disclosing "any of [Plaintiff's] confidential and/or proprietary information and/or trade secrets for any purpose" to fail that standard). Accordingly, the Motion is denied to that extent as well, and the Court has limited the injunctive relief granted to the four categories of alleged trade secrets as to which Rokt has adequately demonstrated sufficiently serious questions on the merits to make them fair ground for litigation of Rokt's claims.[11] See discussion supra pp. 17-30. In sum, the Court finds that the foregoing tailored relief sufficiently mitigates Defendants' concerns about continuing the operation of their business throughout the pendency of this litigation and adequately protects Rokt's trade secrets and confidential information, as described above, from being improperly used to advance Defendants' business. See Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 119 (2d Cir. 2009) ("In all cases, the relief should be narrowly tailored to fit specific legal violations and to avoid unnecessary burdens on lawful commercial activity." (internal quotation marks and citation omitted)).

The Court also finds that a nominal bond of $10,000 is sufficient to comply with Federal Rule of Civil Procedure 65(c), which provides that security must be given in an amount

---

[11] Aside from the twenty-four original categories listed in Rokt's motion for preliminary injunction—of which the Court considered six and found four to raise sufficiently serious questions on the merits, see discussion supra pp. 17-27—Rokt has not listed with specificity what additional confidential or proprietary information should be encompassed within the requested injunction in its request for relief. (See docket entry no. 7; Jt. Stat. Rpt. at 4-5.) The Court has therefore limited the relief granted to these four categories, which, for the reasons discussed in connection with the Court's analysis of the trade secret and unfair competition claims, see discussion supra pp. 24-26, 33, apparently fall within the Rokt/Groupon Agreement's definition of "Confidential Information," even if they are ultimately not found to constitute trade secret material.

"the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). As the plain language of the rule implies, the purpose of bond is to "secure against the wrongful issuance of [an] injunction." Elite Licensing, Inc. v. Thomas Plastic, Inc., 250 F. Supp. 2d 372, 391 (S.D.N.Y. 2003). "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm . . . ." Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 136 (2d Cir. 1997) (internal quotation marks and citation omitted); see also Ferguson v. Ruane Cuniff & Goldfarb Inc., No. 17-CV-6685-ALC, 2021 WL 5507028, at *1 (S.D.N.Y. Nov. 24, 2021) ("Where a party does not demonstrate a likelihood of financial harm, a district court need not impose a bond." (citation omitted)). The party to be enjoined bears the burden of establishing a rational basis for the amount of the proposed bond. Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006). "In fixing the amount of security required, a court is not required to order security in respect of claimed economic damages that are no more than speculative." Id. (citation omitted).

Defendants requested a "seven, eight-figure type of bond[,]" primarily arguing that a "substantial" bond is necessary because injunctive relief would "put them out of business." (Apr. Hrg. Tr. at 30-31; see also Defs. Opp. Mem. at 25.) Rokt contends that no bond is necessary "[i]n light of the considerable evidence of Defendants' misappropriation, unfair competition, [and] breach of contract" (Pls. Mem. at 24), as well as "the short amount of time [D]efendants have been in business, and so the relatively low amount they have to lose, and the valuation of Rokt, which shows the potential to pay any damages to [D]efendants for being allegedly wrongfully enjoined" (Apr. Hrg. Tr. at 11). Because (1) Defendants do not point to any evidence supporting the large and unspecified amount of bond that they have requested, such

as annual revenue figures, (2) the Court has tailored Rokt's requested relief to mitigate, in part, Defendants' concern regarding the continuation of their business, (3) Defendants concede that they were able to successfully cease certain practices that Rokt had sought to enjoin (Nolz Supp. Decl. ¶ 37), and (4) Rokt "recently attained a valuation of $2.4 billion" (Firmstone Decl. ¶ 14), demonstrating its ability to pay any damages to Defendants that would stem from them being wrongfully enjoined, the Court finds that a relatively nominal amount of bond—$10,000—is sufficient for purposes of Rule 65(c).

CONCLUSION

For the foregoing reasons, Rokt's motion for a preliminary injunction is granted as set forth in the preceding section, and is otherwise denied.

The Clerk of Court is respectfully directed to file this Memorandum Opinion and Order Granting Preliminary Injunction under seal with access to selected parties only pending further order of the Court, in order to afford the parties an opportunity to request redactions prior to public filing, to the extent such redaction is necessary and consistent with governing law.  See, e.g., Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119-20 (2d Cir. 2006).  A separate order directing the parties to meet, confer and report to the Court regarding any requested redactions will follow entry of this Memorandum Opinion and Order Granting Preliminary Injunction.

Docket entry no. 7 is resolved.

SO ORDERED.

Dated: New York, New York
      September 5, 2025

                        /s/ Laura Taylor Swain
                        LAURA TAYLOR SWAIN
                        Chief United States District Judge